**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Joseph Alfred TANNER et al.,
Defendants-Appellants.**

**Nos. 17917–17919.**

United States Court of Appeals,
Seventh Circuit.

March 3, 1972.

Rehearing Denied June 9, 1972.

Certiorari Denied Oct. 24, 1972.
See 93 S.Ct. 269.

See also, D.C., 279 F.Supp. 457.

Abraham Glasser, New York City, Sherman C. Magidson, Chicago, Ill., Jasper G. Harris, Jr., Houston, Tex., Barry S. Berger, Baltimore, Md., Maurice Edelbaum, New York City, for defendants-appellants.

Richard L. Rosenfield, Criminal Division, Appellate Section, Dept. of Justice, Washington, D. C., James R. Thompson, U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and FAIRCHILD and PELL, Circuit Judges.

SWYGERT, Chief Judge.

This appeal challenges appellants' convictions for substantive offenses under 18 U.S.C. §§ 837, 1363, 2275 and for conspiracy under 18 U.S.C. § 371. The indictments of Joseph A. Tanner, Jack A. Pearl, Lawrence H. Rice, and Walter B. Chipman arose out of the bombing of the *S.S. Howard L. Shaw* in the Calumet Harbor, Chicago, the bombing of a transformer at the site of a grain elevator terminal in Ohio, and a series of bombings of railroad tracks in Ohio owned by the Wabash Railroad and the New York Central Railroad. All four appellants were convicted under Count I of conspiring to perform the above acts and under Count III of transporting explosives in interstate commerce (in violation of 18 U.S.C. § 837). Tanner and Pearl alone were found guilty of Count IV which alleged they had willfully and maliciously destroyed a structure, a dock at Calumet Harbor, and a vessel, the *S.S. Howard L. Shaw*, within the special admiralty and territorial jurisdiction of the United States (in violation of 18 U. S.C. § 1363), and Count VII which alleged they had knowingly and unlawfully set fire to a vessel of foreign registry within the jurisdiction of the United States (in violation of 18 U.S.C. § 2275).[1] Tanner and Pearl were sen-

---

1. The original indictment charged the defendants with seven counts. Counts II and V were dismissed on the motion of the Government prior to trial. Count VI was dismissed by the trial court for violation of the ex post facto clause of the Constitution.

tenced to five years on Counts I, IV and VII and one year on Count III (the sentences on all counts to run concurrently). Rice received a six-month sentence and Chipman a year sentence on Count III. Chipman and Rice also received suspended sentences under Count I with five years' probation to begin upon the expiration of the sentences assessed under Count III.

The pivotal witness against appellants was Alvin Junior Cupp, a codefendant originally charged under the same indictment,[2] but whose trial was severed from and held prior to that of the remaining four. Cupp's testimony, which we briefly summarize, related events occurring between May 1963 and September 1963. Tanner, the vice president of the Seafarer's International Union (S.I.U.), and Pearl, his lieutenant, were cast as the instigators of a program of violence and intimidation, in which Rice, Chipman, and Cupp participated, directed against several companies with which the union was in dispute.

The conspiracy was allegedly formed in late April or early May 1963 at a meeting near Detroit attended by Pearl, Chipman, Rice, and Don Swait (a Canadian S.I.U. official who is an unindicted coconspirator). Tanner did not attend because of prior engagements, but was said to have ordered the meeting convened. According to Cupp's account, the purpose of the meeting was to arrange for Pearl and Cupp to relieve Chipman and Rice of their responsibilities for "the rough stuff on the Great Lakes."

On June 13, 1963 the first trip to obtain explosives was organized during a meeting of Chipman, Rice and Cupp, in Tanner's office in the S.I.U. hall in River Rouge, Michigan. The following day, Chipman, Rice, and Cupp travelled to LaFollette, Tennessee, to purchase explosives from Virgil Brooks (another unindicted coconspirator). Meetings were held throughout the month of June, variously attended by Cupp, Rice, Chipman, Pearl, and Swait, at which plans were discussed to blow up the C & O and Lake Front Coal Docks in Oregon, Ohio, and a store in Maumee, Ohio, the owner of which also owned grain elevators in Maumee and Toledo. On two occasions, the evening of June 29 and the morning of July 1, 1963, Cupp placed dynamite on the Wabash railroad tracks in Maumee with the aim of stopping trains carrying grain from reaching the grain elevators and thus interfering with the loading of ships.

On July 3, 1963, at the S.I.U. hall in River Rouge, Tanner gave Cupp $150, part of which was reimbursement for his expenses. Cupp reported that his supply of explosives was nearly depleted and during the ensuing discussions, attended at a later point by Rice, a second trip to LaFollette was arranged. Rice and Cupp later travelled to LaFollette to obtain additional explosives from Brooks. On July 12, 1963 Pearl met with Cupp in Toledo and conveyed Tanner's wish that the transformers in the grain elevator area at the Mid-State Terminal in Toledo be bombed. That night Cupp carried out the plan. Early on August 1, allegedly at the instigation of Pearl, Cupp placed explosives on the Wabash railroad tracks in Toledo. On August 2, once again after meeting with Pearl, Cupp placed explosives underneath the New York Central tracks in Ashtabula, Ohio.

On September 5, 1963, at the S.I.U. hall in River Rouge, Cupp, Tanner, and Pearl discussed bombing a ship of the Upper Lakes Shipping Company, docked on the Calumet River in Chicago. Pearl accompanied Cupp that evening to "look over" the ship and obtained reservations for Cupp at a Chicago motel. On September 6, 1963 Cupp placed explosives near the *S.S. Howard L. Shaw*. After the bombing of the *Shaw*, Pearl

---

2. Cupp was found guilty on Counts I, III and IV and was given a ten-year sentence (subsequently reduced to one year) to run concurrently with a five-year sentence imposed for another offense.

and Tanner arranged to have Cupp employed as a seaman and leave from Houston for a two-month trip. Cupp and Pearl then arranged to have Brooks contact Pearl in order to carry on with Cupp's activities during his absence.

The Government's principal corroboration for Cupp's account was the testimony of three witnesses: Rene Turcotte, a member of the S.I.U. of Canada, testified to meeting Pearl in late July or early August of 1963 on two occasions and related statements made by Pearl about plans to bomb Upper Lakes Shipping Company ships. Guy Swadley, an unindicted coconspirator, testified that in June 1963, at the S.I.U. hall in Milwaukee, Pearl discussed the use of high-powered rifles on ships in order to slow down their loading and questioned Swadley about where explosives might be obtained.[3] Brooks related his dealings with Cupp in LaFollette during the summer of 1963. He also pointed out that Rice was similar in appearance to a man accompanying Cupp on one occasion, but admitted he was uncertain. Brooks testified to seeing Cupp in September or October 1963 in LaFollette and to making arrangements to meet with Pearl in Detroit. He then described meeting with Pearl at a Detroit hotel.[4]

Counsel for Rice and Chipman relied principally on alibi testimony for the period in question. By far the most important part of the defense of all appellants, however, consisted of attacks on Cupp's credibility since his performance as a witness can best be described as chameleon-like. Cupp's trial testimony, which incriminated all four appellants, was an explicit repudiation of the account he had given at his severed trial. Furthermore, he had changed his story at least twice prior to his own trial. The circumstances surrounding these abrupt shifts were repeatedly emphasized by the defense and included the following. In March 1965 Cupp was in the United States Penitentiary at Terre Haute, Indiana, serving a five-year sentence for bombing railroad tracks in Marquette, Michigan. In December 1965 he was brought from Terre Haute to the Cook County Jail in Chicago. Between December 1965 and April 1966 he was questioned by the Federal Bureau of Investigation on several occasions. In April 1966 he testified before a grand jury against the appellants.[5] In December 1966 he was paroled after serving approximately twenty-one months of the Marquette sentence.[6]

Between May and July 1967 Cupp made several overtures to the defense for the purpose of recanting his grand jury testimony and accusing the Government of suborning perjury. On July 16, 1967 when Cupp and Pearl were to meet with Pearl's lawyer to notarize tape-recordings and written transcripts of Cupp's conversations with Pearl, the FBI arrested Pearl for failing to carry his draft card[7] and seized his briefcase containing the tapes and transcripts. That evening Cupp was arrested for illegal possession of a pistol and released on his own recognizance. Approximate-

---

3. The defense offered to impeach Swadley on cross-examination with a prior inconsistent statement signed in the office of a Milwaukee attorney. On redirect, however, Swadley reaffirmed his trial testimony and claimed that he had neither read the statement thoroughly when he signed it nor did he understand it.

4. On cross-examination it was revealed that Brooks had given inconsistent testimony to the grand jury and to the FBI. He admitted that he had lied on these occasions out of fear of implicating Cupp and himself.

5. Cupp did not, however, mention Rice in his grand jury testimony except to remark that he had not done any "jobs" with him.

6. Testimony during the trial revealed that the Government had given Cupp some assistance in moving his family from Toledo to the Chicago area, getting him a job as a bus driver, and obtaining an unsecured loan from a Chicago bank. Cupp and his wife also received witness fees for their grand jury appearances.

7. Charges against Pearl were subsequently dropped by the Government in December 1968.

ly three weeks later his parole was revoked, and he was returned to jail. From July 1967 through March 1968 Cupp continued to accuse the Government of subornation and claimed he would not be a government witness.

Cupp's trial was severed from that of the other defendants in March 1968 and was held in the following May. Toward the end of 1968, Cupp recanted again, admitting to the FBI that he had committed perjury during his trial. In April and May of the following year, Rice, Chipman, Tanner, and Pearl were tried, and Cupp became the Government's pivotal witness. In August 1969 Cupp's ten-year sentence was reduced to one year.

Because of .this history, Tanner and Pearl's principal challenge is directed at the admissibility, or alternatively, the credibility of Cupp's testimony, though they claim error in other aspects of the trial as well. Rice and Chipman claim that the trial judge, erred in denying their motions for severance and their motions to dismiss several counts of the indictment as defective. *See* United States v. Tanner, 279 F.Supp. 457 (N.D. Ill.1967).

### I

Appellants challenge the admissibility of Cupp's testimony on fourth amendment grounds. They claim that Pearl's arrest on July 16, 1967, which was subsequently declared unlawful by the trial judge, and the seizure of the contents of Pearl's briefcase including the tape recordings and transcripts, set off a chain of events leading ultimately to Cupp's return as the Government's star witness. Accordingly, appellants characterize Cupp's testimony as the "fruit" of an unlawful arrest under the authority of Wong Sun v. United States, 371 U.

S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962).

In *Wong Sun*, a defendant's admissions made during the course of an unlawful arrest and evidence later obtained as a result of these admissions were held to be inadmissible as the "fruits" of "official illegality." The crucial question was the relationship between the lawless conduct and the challenged evidence. "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. at 488, 83 S. Ct. at 417.

In the instant case the trial judge held that the July 16 arrest was unlawful and, consistent with *Wong Sun*, conducted a hearing on the defense motion to suppress. After extensively reviewing the contents of Pearl's briefcase, the judge assured appellants that if, "during the course of the trial . . . any evidence at all that the Government seeks to introduce is the product of a poisoned tree, the court will declare a mistrial and certainly would prevent that evidence from being introduced."

Appellants' challenge on appeal is directed only at the Government's use of the tapes found in Pearl's briefcase. But they do not claim the tapes should have been excluded from evidence; indeed, the tapes were exculpatory, and appellants sought to introduce them in their entirety. Nor do they argue that the Government gleaned any investigative leads from the tapes that resulted in uncovering other incriminating evidence. Rather, they claim that the method of obtaining Cupp's testimony constituted— in some undefined way—the illegal use to which the tapes were put.[8] Thus,

---

8. Appellants claim. another "fruit" of the illegal arrest. When the Government learned of the tapes, the defense lost the element of surprise. The Government now had "months and months . . . of opportunity to build up a neatly detailed 'case' refuting Cupp's secret revelations to Pearl in the tape-recordings." Appellants appear to be claiming that where an illegal search completely reveals the defense's strategy, the Government's entire case at trial can be seen as the "fruit" of the arrest. We need not consider at what point disclosures of the defendants'

they maintain that Cupp's trial testimony was the "fruit" of illegality to the extent that the arrest provided the instrumentalities, namely, the tapes, by which to coerce Cupp to become a government witness.

 Clearly, the relationship between Cupp's testimony at appellants' trial in April 1969 and the tapes seized during Pearl's arrest in July 1967 is tenuous at best, particularly in the light of Cupp's undisputed reputation for unreliability. In any event, the argument in the instant case hinges on the charge that Cupp was coerced by the Government into changing his testimony at trial. Upon analysis this is not a fourth amendment challenge at all, but one which charges the Government with suborning perjury, which we find is baseless. The *sine qua non* of a charge of subornation is that perjury has in fact been committed. Whether or not Cupp perjured himself at this trial was the principal issue before the jury. By its verdict, the jury decided he had not, and we may not legally controvert that determination.[9]

 Appellants' second challenge to Cupp's testimony relates to his credibility. They claim that the testimony should be held incredible as a matter of law and thus inadmissible, pursuant to a finding of a denial of due process of law or to this court's supervisory jurisdiction. Credibility is preeminently a matter for the jury to determine. Pinkowski v. Sherman Hotel, 313 F.2d 190, 193 (7th Cir. 1963); LaPresti v. Goodall Oil Co., 290 F.2d 653, 655 (7th Cir. 1961). Appellate review of credibility is prohibited absent extraordinary circumstances. In Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), the testimony of a government informer was held to have so tainted the proceedings against the defendants as to require a new trial with the challenged testimony excluded. *Mesarosh,* however, was not dealing with appellate review of a jury's prior determination of credibility. The witness in question was shown to have perjured himself on several occasions subsequent to the trial, information which was obviously unavailable to the jury. Moreover, it was the Government who raised the challenge to the credibility of its own witness.[10] In Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 394 (1966), a case

---

case taint the entire prosecution since we find that the Government was not materially surprised by the discovery of the tapes. *See* Silverthorne Lumber Co., Inc. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

9. Appellants also claim that they did not have an adequate opportunity to demonstrate that electronic monitoring took place in derogation of the fourth amendment. The charge of illegal "bugging" was made on at least three occasions: at the suppression hearing of December 1967, in a separate suppression hearing prior to Cupp's severed trial, and in a third hearing held prior to the trial of the remaining four appellants. The Government denied these charges repeatedly and filed letters with the court from the Department of Justice indicating that, according to its records, no such monitoring had ever taken place. The trial judge was satisfied by this evidence. We find that appellants did receive an adequate hearing on this issue and see no basis for overturning the lower court's finding.

10. The Court did make its own finding as to the credibility of the witness based on the new evidence of perjury before it, rather than remand the issue to the district court as requested by the Government. The case, however, was unusual in two respects: both as to the Court's determination of credibility, and as to the remedy of granting a new trial. The Court's findings regarding credibility seem to have been prompted by the fact that the Government was challenging its own witness. 352 U.S. at 10, 77 S.Ct. 1. Given the conclusion that the testimony was incredible, along with the Court's reasoning that a remand to the trial judge to reweigh the evidence would be inappropriate since a jury and not the judge had been the original trier of facts, the only remedy remaining was an order for a new trial. Ordinarily, a new trial will not be granted where the additional evidence is "merely cumulative or impeaching," and the challenger is the defense counsel. 352 U.S. at 9, 77 S.Ct. 1; Shotwell Mfg. Co. v. United States, 371 U.S. 341, 357, 83 S.Ct. 448, 9 L.Ed.2d 357 (1962).

more directly in point, the Court rejected the claim that the testimony of the principal government witness be held incredible as a matter of law, even where the witness was a paid informer who had contacted the Government while in prison, received clemency for his services and then ingratiated himself to the defendant in order to report on defendant's activities. The Court concluded that, however strong this informer's motives to lie may have been, "[t]he established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." 385 U.S. at 311, 87 S. Ct. at 418. In the instant case appellants' charges that the Government had used money and other favors to suborn Cupp's perjury were placed before the jury in the intensive cross-examination of Cupp. The jury took them into account and held them to be inconsequential. We will not challenge that determination.[11]

■ Appellants claim error in the refusal of the court to play the tapes seized during the July 16 arrest in their entirety. We are persuaded that this claim has no basis. The trial judge ruled that the tapes were to be used to impeach Cupp only in the event that Cupp denied making a specific statement at the time the conversation was recorded. The judge's reasoning was sound. Cupp never denied that he had made the recording or that the statements transcribed from the recording and read to him at cross-examination were his. He simply claimed that he had lied on that occasion. At one point in the proceedings, the judge was satisfied that the requirements for impeachment had been met and approved the playing of the tapes with the

proviso that the defense counsel exclude those portions which did not specifically impeach Cupp's trial testimony. No time limit was imposed so long as this requirement was followed. Moreover, the judge placed full responsibility for the editing on the defense counsel alone. When counsel began to play the tapes, the Government objected, claiming that an unedited version was being used. The judge agreed, but nevertheless ruled: "I will let you [the defense counsel] do it because you started doing it. . . ." After approximately eight minutes, the judge ordered the recorder stopped, and reiterated his direction that the tapes might be played again only if they were properly edited. We cannot say that the court abused its discretion in so ordering.

■ Appellants engage in an extended argument regarding the prejudicial effect of the Government's final summation. Their contentions bear discussion only with respect to one objection, the challenge to the prosecutor's statement that "when the government of the United States puts a witness on the stand, we vouch for his entire testimony." Considered alone, that statement would be outside the scope of remarks that a prosecutor may be permitted to make. *See* Greenberg v. United States, 280 F.2d 472 (1st Cir. 1960). Though we ordinarily would not countenance remarks of this nature, we cannot say that in the context of the instant case the prosecutor's statement requires reversal of these convictions.[12] No objections were made—nor were they appropriate—to the Government's opening remarks in its summation. The attorneys for Tanner, Pearl, and Rice responded with specific charges of subornation of perjury directed against several FBI agents and United States attorneys. Clearly, their attacks invited a response. *See* Lawn v.

11. We reject appellants' claim that the trial court erred in denying instructions relating specifically to Cupp's credibility. The requested instructions would have been tantamount to declaring Cupp's testimony incredible, which the trial court rightfully declined to do.

12. Counsel for Chipman was the only member of the defense to formally object to the Government's closing remarks. For the remaining defendants this issue is considered only with respect to the question of whether the Government's actions constituted "plain error" under Fed.R.Crim.P. 52(b).

United States, 355 U.S. 339, 359 n. 15, 78 S.Ct. 311, 2 L.Ed.2d 321 (1957). The Government, in its rebuttal, countered each of the charges of undue influence. The quoted remark was simply a summary comment following these specific denials. Taken with the remarks preceding and following it, this statement only reaffirmed the Government's disclaimers of subornation. It did not suggest that Cupp's testimony ought to be believed simply on the authority of the United States Government,[13] and thus was not prejudicial. United States v. D'Antonio, 362 F.2d 151 (7th Cir. 1966).

Tanner and Pearl advanced other contentions regarding the conduct of the trial: that the court received evidence outside the scope of the indictment and that the trial court abused its discretion in denying the defense's request for a continuance. We are convinced that these contentions have no merit.

## II

Rice and Chipman contend the trial judge erred in denying their motion for severance. Whether trials which have been properly joined under Rule 8, Fed.R.Crim.P., ought be severed pursuant to Rule 14, Fed.R.Crim.P., is a decision squarely within the discretion of the trial judge. Appellate review will hinge upon showing a clear abuse of discretion. Tillman v. United States, 406 F.2d 930 (5th Cir.) cert. denied, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969); United States v. Kahn, 381 F.2d 824 (7th Cir.), cert. denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967); United States v. Echeles, 352 F. 2d 892 (7th Cir. 1965). A defendant bears the burden of demonstrating that he has been prejudiced by the joinder; that burden is a difficult one. "The defendant must show something more than the fact that 'a separate trial might offer him a better chance of acquittal.'" Tillman v. United States, 406 F.2d at 935. Joinder must be shown to have rendered the trial unfair in order to counterbalance the Government's valid interest, as expressed in Rule 14, in avoiding a multiplicity of trials.[14] Kroll v. United States, 433 F.2d 1282, 1287 (5th Cir. 1970), cert. denied, 402 U.S. 944, 91 S. Ct. 1618, 29 L.Ed.2d 112 (1971).

The major argument for severance in the instant case stems from the fact that the attorneys representing Tanner and Pearl had defended the Government's star witness, Cupp, in his previous, severed trial. Faced with Cupp's explicit recantation of his prior testimony, counsel for Tanner and Pearl decided to go beyond attacking Cupp's credibility and sought to charge the Government with suborning perjury. The Government responded in kind, accusing Pearl and Tanner's counsel of subornation.

Rice and Chipman claim that the resultant charges and countercharges, repeated vitriolic exchanges and the introduction of information about "payoffs" and the like into evidence impermissibly prejudiced their trials.[15] We disagree. On the one hand, Rice cannot make that claim since his counsel joined in the fray,

13. Chipman argues that even if these remarks were not prejudicial to his codefendants, whose accusations invited the Government's response, they were prejudicial to his own defense where he did not join in the charges. We disagree. Since we have held that the Government's remarks could only have been interpreted as responsive to the specific charges levelled against it, and since Chipman's attorney expressly disavowed all such charges, we cannot see how Chipman was impermissibly prejudiced.

14. *See* 8 J. Moore, Federal Practice ¶ 14.04 [1] (2d ed. 1970); Joint and Single Trials under Rules 8 and 14 of the Federal Rules, 74 Yale L.J. 553, 566 (1965).

15. This claim is distinguishable from that made in Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1941). In *Glasser*, the attorney representing one codefendant was assigned to defend the other codefendant notwithstanding the fact that they appeared to have inconsistent defenses. One codefendant then challenged this procedure on the grounds that he had been denied his sixth amendment rights to effective assistance of counsel. Rice and Chipman are not in a position to make this claim.

however reluctantly, during his closing remarks. On the other hand, Chipman's counsel took great pains to extricate his defense from that of the others. Moreover, the issues were not so complicated as to be beyond the "capacity of the jurors to follow the court's admonitory instructions" and "keep separate the evidence that is relevant to each defendant." Peterson v. United States, 344 F. 2d 419, 422 (5th Cir. 1965).[16]

### III

Rice and Chipman further claim that Count III of the indictment fails for duplicity. The Count charged all appellants with transporting explosives in interstate commerce with the intent of using them to damage "any building or other real or personal property . . . beginning on or about June 6, 1963 and continuing thereafter to about September 6, 1963 . . . from LaFollette, Tennessee, to divers other places and to Chicago, Illinois." Rice and Chipman moved to dismiss the Count or, alternatively, asked for a bill of particulars. The court only granted the latter request. The bill listed the "divers other places" to which explosives were transported as Detroit, Toledo, Woodhaven, Michigan, Monroe, Michigan, and Milwaukee. It stated the dates on which explosives were allegedly transported were "between June 7, 1963 and June 8, 1963", "on or about June 22, 1963", "on about June 26, 1963", "in the month of July 1963", and "in the months of August and September 1963". Despite this information, Rice and Chipman continued to object to the Count. Their objections were overruled.

■■■ The Government argues that Count III alleged only a single, continuing transaction "beginning on or about June 6, 1963 and continuing thereafter

to on or about September 6, 1963." We disagree. Duplicity under Rule 8(a), Fed.R.Crim.P., "consists of joining in the same count [of an indictment] two or more distinct and separate offenses." Optner v. United States, 13 F.2d 11, 12 (6th Cir. 1926). A count is not duplicitous if it simply charges the commission of a single offense by different means. Driscoll v. United States, 356 F.2d 324 (1st Cir. 1966); United States v. MacAlpine, 129 F.2d 737 (7th Cir. 1942). The line between multiple offenses and multiple means to accomplish a single continuing offense is, however, especially difficult to draw in the instant case. The prohibited conduct is described in 18 U.S.C. § 837 as the act of transporting explosives in interstate commerce for the purpose of destroying any building or other real or personal property. Differentiating single offenses under this section requires defining at what point the act of transporting explosives is completed.

Clearly, the Government has some discretion in making this determination. Thus, in Cohen v. United States, 378 F.2d 751 (9th Cir.), cert. denied, 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215 (1967), the court upheld a count that charged defendants with knowingly transmitting wagering information by telephone between specified geographic points, during a specified time period, and for a specified purpose, even where a series of phone calls was involved. The Government in the instant case similarly argues that, although any part of the route between LaFollette, Tennessee and Chicago could comprise a separate trip and thus a separate offense, it was justified in construing each trip as part of the overall illegal scheme of transporting explosives across state lines. Indeed, fair judicial administration requires that

---

16. Nor can we find any other ground for granting severance of the trials of Rice and Chipman. The fact that they were minor defendants, charged in only two of the seven-count indictment is not sufficient. *See* United States v. Nomura Trading Co., 213 F.Supp. 704 (S.D.N.Y. 1963). In addition, though their defense strategy differed from that of counsel for Tanner and Pearl, it cannot be said that they were presenting mutually exclusive defenses likely to raise the kind of problems presented in DeLuna v. United States, 308 F.2d 140 (5th Cir. 1962).

prosecutors be encouraged to exercise their discretion to avoid unnecessarily cumulating offense categories and thereby cumulating punishments.

There are, however, limits to the Government's discretion. The act of transporting explosives cannot be so vaguely defined as to include successive trips, by different defendants, carrying different carloads of dynamite. The *Cohen* indictment was far more precise than the one before us; the challenged count alleged a series of phone calls between one defendant and two other parties, between Las Vegas and San Francisco, in the course of a single month. In the instant case, all four appellants were charged with transporting explosives at some time during the four-month period. Their individual roles are neither specified in the indictment nor in the bill of particulars. The Count as written could be interpreted to include more than one trip to LaFollette for the purpose of picking up explosives.[17] Moreover, the route described in each trip from LaFollette to Chicago is a circuitous one and required more time than would ordinarily be the case. The Government cannot delineate as a single offense all trips that occurred within a period of time, that involved the crossing of numerous state lines, that at some point crossed into the Northern District of Illinois, and that involved the varied participation of any one of four men. Each trip could be considered part of a continuing scheme to transport explosives only if the scheme were so broadly defined as to amount to a general conspiracy allegation rather than a substantive offense. Since Count III alleges a substantive offense, we find it duplicitous.

■ ■ The duplicity of Count III would not require a dismissal if it were shown to constitute "harmless error" under Rule 52(a), Fed.R.Crim.P. The prohibition against duplicity is designed to protect a defendant's right under the sixth amendment to notice of the "nature and cause of the accusation" against him so that he may prepare a defense, and to guard against the possibility that "confusion as to the basis of the verdict may subject the defendant to double jeopardy in the event of a subsequent prosecution." 8 J. Moore, Federal Practice ¶ 8.03[1], at 8–6, 7 (2d ed. 1970). The Government claims that the first policy was effectuated by pre-trial discovery, the revelation of Cupp's grand jury testimony to the defense at the inception of the trial, and Cupp's prior trial on the same Count. We disagree. The Government's case against Cupp did not adequately reveal the case they were to bring against each of the individual defendants. Cupp's grand jury testimony was disclosed immediately before trial and thus at a comparatively late stage in the proceedings. Finally, though the Government characterizes the pre-trial discovery as "extensive," it does not specify how discovery cured the defects of the indictment. In any event, the Government ignores the second policy—the protection against double jeopardy—which remains compelling consideration in the instant case. United States v. Leggett, 312 F.2d 566, 570 (4th Cir. 1962); United States v. Warner, 428 F.2d 730, 735 (8th Cir.), cert. denied, 400 U.S. 930, 91 S.Ct. 194, 27 L.Ed.2d 191 (1970).

We find no merit to the remaining contentions of these appellants regarding the impeachment of one of Rice's defense witnesses, nor the sufficiency of the evidence against Chipman.

IV

■ In addition, Rice and Chipman challenge Count IV of the indictment for failing to allege acts that fall within the "special maritime and territorial jurisdiction of the United States." We fail to see how Rice and Chipman have standing to raise this claim since neither were

17. Evidence subsequently presented at trial did in fact show that the Government intended to prove at least two separate trips to LaFollette.

**140**

indicted for the substantive offense charged. The offense charged in Count IV affected the trial of these appellants only insofar as it was one of the several unlawful objects alleged in the conspiracy count. However valid appellants' claim is on this issue, it does not affect their convictions on the conspiracy count so long as any one of the objects of the conspiracy is unchallenged.

■ Tanner and Pearl, who were charged under Count IV, join in Rice and Chipman's attack on this Count.[18] In addition, Pearl alleges that his conviction under Count I of the indictment is barred by the fifth amendment prohibition against double jeopardy. Neither of these appellants, however, has directed any specific attack against the validity of the remaining Count of the indictment, Count VII.[19]

■ Until recently, the validity of Count VII would have rendered unnecessary further inquiry into the validity of Count IV where Tanner is concerned, and Counts I and IV where Pearl is concerned. Appellate review would here be avoided since Tanner and Pearl's sentences under Count VII are concurrent with the sentences assessed under all other counts of the indictment. Lawn v. United States, 355 U.S. 339, 359, 78 S.Ct. 311, 2 L.Ed.2d 321 (1957); Hirabayashi v. United States, 320 U.S. 81, 85, 63 S.Ct. 1375, 87 L.Ed. 1774 (1942). But the Supreme Court's decision in Benton v. Maryland, 395 U.S. 784, 791, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), constitutes

a reevaluation of the "concurrent sentencing doctrine." *Benton* holds that there is no jurisdictional bar (stemming from the requirement of justiciability) to a consideration of all counts under concurrent sentences. The Court points out that an unreviewed count could increase an appellant's future sentencing under an habitual offender statute, or adversely affect his chances for parole, or be used to impeach his testimony at a future trial. *Benton* suggests that review is desirable where adverse collateral consequences of this nature may flow from conviction. *See* Davie v. United States, 447 F.2d 480 (7th Cir. 1971); United States v. Febre, 425 F.2d 107 (2d Cir. 1970), cert. denied, 400 U.S. 849, 91 S. Ct. 40, 27 L.Ed.2d 87 (1971). Since we cannot say that there is no possibility of undesirable collateral consequences attendant upon these convictions, we choose to consider the validity of all the challenged counts.

■ Count IV charges these appellants with willfully and maliciously destroying a structure, a dock at the Calumet Harbor and a vessel, the S.S. Howard L. Shaw, within the special admiralty and territorial jurisdiction of the United States in violation of 18 U.S.C. § 1363. The "special maritime and territorial jurisdiction" of the United States is generally defined in 18 U.S.C. § 7; since the *Shaw* was a vessel of Canadian registry and ownership, these offenses will qualify for federal criminal jurisdiction only if they come within the bounds of 18 U.S.C. § 7(1).[20] The Gov-

---

18. Pearl and Tanner claimed to join in the arguments of Rice and Chipman "where applicable." We point out that they ordinarily may not do so where it can be shown that they did not properly object to, nor join the objections of the other defense counsel, unless the defect involved can be characterized as "plain error."

19. Count VII alleged that "appellants Tanner and Pearl knowingly and unlawfully set fire to a vessel of foreign registry, namely, the S.S. Howard L. Shaw and did place bombs and explosives in and upon such vessel . . . while within the

jurisdiction of the United States . . . in violation of 18 U.S.C. § 2275." We accept the view that the phrase "within the jurisdiction of the United States" has been broadly construed.

20. 18 U.S.C. § 7(1) defines the special maritime and territorial jurisdiction of the United States as follows:

The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or un-

ernment must show that the destruction of the *Shaw* occurred either upon the "high seas" or upon any other body of water that is both within the United States' admiralty and maritime jurisdiction and without the jurisdiction of any particular state.

The explosion of the *Shaw* took place while the vessel was docked at the Calumet Shipyard Dock in the Calumet Harbor, a location that cannot be characterized as "high seas." While the Great Lakes and the connecting waterways between some of the Great Lakes have been held to qualify as "high seas," United States v. Rodgers, 150 U.S. 249, 14 S.Ct. 109, 37 L.Ed. 1071 (1893), Hoopengarner v. United States, 270 F.2d 465 (6th Cir. 1959), we cannot say—as the Government urges—that there is authority to extend that category to a waterway connecting one of the Great Lakes with other waterways in the State of Illinois and ultimately, with the Gulf of Mexico. Such a construction would extend the "special maritime and territorial jurisdiction" of the United States beyond recognition.

Nor can we say that offenses occurring within the Calumet Harbor fit into the second applicable category of 18 U.S.C. § 7(1). Since the words "out of the jurisdiction of any particular state" suggest that there can be no concurrent federal and state jurisdiction, a finding of state jurisdiction is conclusive. There is little doubt that the events surrounding the explosion of the *Shaw* occurred within the jurisdiction of the State of Illinois. *See* Chicago Regional Port Dist. Act, Ill. Rev.Stat., ch. 19, §§ 152–178. We agree, then, that the offenses charged in Count IV fail to qualify for federal jurisdiction under 18 U.S.C. § 1363.

Finally, Pearl attacks Count I as violative of the double jeopardy pro-

vision of the fifth amendment. His claim is based upon an indictment dated August 24, 1963 brought against Pearl and Cupp for conspiracy to bomb railroad tracks in Marquette, Michigan during the period from June 15, 1963 to the date of the indictment. That Pearl was placed in jeopardy as a result of this indictment was clear. After the jury had been impaneled and evidence taken, Cupp entered a plea of guilty to the conspiracy count of the indictment, and the Government chose to dismiss all counts against Pearl.

It is also apparent that the challenged count in the instant case describes a conspiracy which substantially overlaps with the offense charged in the Marquette indictment. Indeed, the Government concedes that the Marquette charge was a "sub-agreement" of the overall plan alleged in the current prosecution. The conspiracy with which Pearl is here charged is claimed to have run from April to September 1963 and to have involved the bombing of railroad tracks and grain elevators in Ohio and the bombing of the *S.S. Howard L. Shaw* in Chicago. The first indictment charged a conspiracy lasting from June 15 to August 24, 1963 to blow up railroad tracks in Marquette. The governing constitutional principle is that a single continuing conspiracy, however diverse its objects, cannot be broken down into component sub-agreements for the purpose of multiple punishments or multiple prosecutions. Braverman v. United States, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942); United States v. Palermo, 410 F.2d 468 (7th Cir. 1969); United States v. Varelli, 407 F.2d 735 (7th Cir. 1969).[21]

The Government claims an exception to this rule where it was unaware of all the defendant's crimes at the time of the initial proceedings. *See* Ashe v.

---

der the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.

21. The facts of *Braverman* are limited only to the problem of cumulating punishments in a single prosecution, but the court's rationale applies to both the situations of multiple punishments and of multiple prosecutions.

Swenson, 397 U.S. 436, 453 n. 7, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1969) (concurring opinion); United States v. Buonomo, 441 F.2d 922 (7th Cir. 1971). But that exception raises very difficult problems of analysis particularly where the Government's investigation evolves slowly over a period of months. It is often not a question of the Government knowing the exact parameters of the second offense even while prosecuting the first, or alternatively, having no inkling of any further offenses. There may be intermediate stages ranging anywhere from vague intimations to strong suspicions. We are of the view that even where the Government only has strong suspicions of a larger continuing conspiracy, but does not have sufficient evidence to proceed to indictment, it cannot be permitted, consistent with *Braverman*, to fragment prosecution so as to insure that some offenders will come to trial and thereby avoid the risks of a single conspiracy prosecution.

In the instant case, though we agree that the Government did not know the exact scope of the general conspiracy when the Marquette indictment was brought, we cannot agree that it was completely ignorant. Cupp's grand jury testimony suggested that the dynamiting of the railroad tracks in Marquette was part of a continuing agreement between Cupp and Pearl to obstruct commerce in the hopes of influencing the dispute between the Upper Lakes Shipping Company and the S.I.U. The indictment itself suggests that other participants were suspected; Cupp and Pearl were charged with conspiring with each other "and with divers other persons whose names are to the Grand Jury unknown." Finally, by the time the indictment was handed down, August 24, there had already been three bombings of railroad tracks in the Great Lakes area: July 1 at Maumee, August 1 at Toledo, and August 2 at Ashtabula. It is reasonable to assume that by August 24 the Government had good grounds to suspect the existence of a single conspiracy aiming at acts of violence in the Great Lakes area, centering

around the ongoing S.I.U.-Upper Lakes labor dispute, and including Cupp and Pearl. Where the Government was aware of the larger conspiracy to this extent, we cannot find any justification for multiple prosecutions.

 Although we have chosen to consider the counts under concurrent sentences challenged by the appellants because of the possibility of prejudice and have found them to be invalid, we see no reason to require remand for resentencing or for a new trial rather than confining our relief to a reversal of the convictions under these counts. Where we find that the prejudice from the challenged counts is likely to be limited to the possibility of future adverse collateral consequences rather than from the conduct of the past trial and sentencing of valid and invalid counts, reversal of the convictions under the invalid counts is sufficient. *See* The Federal Concurrent Sentence Doctrine, 70 Col.L.Rev. 1099 (1970). In Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), the Court remanded the case in order to determine whether the invalid larceny count tainted the trial of the remaining burglary count since questions of state evidentiary rules were involved. The instant case presents no such problem. In United States v. Febre, 425 F.2d 107 (2d Cir. 1970), cert. denied, 400 U.S. 849, 91 S.Ct. 40, 27 L.Ed.2d 87 (1971), the court held two out of four counts of an indictment invalid on appeal, but ruled that only reversal was necessary. A new trial was not required since the court found that the evidence under the invalid counts would have been admissible under the valid conspiracy count and since it found it unlikely that evidence on the invalid counts had been considered by the jury to establish guilt on the remaining substantive count. Similarly, in this appeal evidence introduced on Count III which charged transporting explosives in interstate commerce was easily distinguishable from evidence on the remaining valid substantive count, Count VII, which dealt with the actual explosion of the *Shaw*. Evidence under Count IV would

be admissible under Count VII in any event since elements of the two offenses are similar. Where appellant Pearl is concerned, trial on the substantive count of the indictment remains valid even where the conspiracy count falls for double jeopardy. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1945). Moreover, extrajudicial statements of codefendants would be admissible once a conspiracy or a joint venture had been shown whether or not it was specifically charged in the indictment. *See* United States v. Schroeder, 433 F.2d 846 (8th Cir. 1970). Finally, as in *Febre*, resentencing is unnecessary where it is unlikely that remand will yield a reduction in sentence. Sentencing for Tanner and Pearl under Count VII was for five out of a possible twenty years; and, for Rice and Chipman sentences under Count I were suspended with five years' probation.[22]

▬▬ Accordingly, we reverse all convictions under Counts III and IV of the indictment, and Pearl's conviction under Count I, but affirm convictions under all other Counts.[23]

22. However, since the starting date for this probationary period depended upon completion of their sentences under Count III, resentencing as to these two defendants for purposes of clarification is required.

23. During oral argument counsel for Tanner and Pearl requested leave to file a motion dealing with Cupp's activities during the pendency of this appeal. We suggested that defense counsel file a written request for leave to file such a motion outlining his reasons why the motion should be filed and giving the Government time to respond. The request for leave to file this motion and the Government's response thereto have been received.

Appellants Tanner and Pearl's request indicates that the basis for relief in their proffered motion is "the fact that the Government's trial witness Alvin Junior Cupp has been contacting defense representatives—and has been making statements to said defense representatives, being a recantation of his trial testimony." They seek to show by way of affidavits of counsel and of a defense investigator the existence and extent of the latest Cupp

recantation. Furthermore, in the affidavits supporting their proffered motion, Tanner and Pearl ask the court to reverse their convictions based on constitutional grounds for a violation of due process or based upon the court's supervisory capacity and remand the case for a new trial.

Since the proffered material is offered for the first time on appeal, was not considered by the district court, and is totally outside the record, it may not be afforded cognizance by this court except for the limited purpose of considering whether the case should be remanded to the district court when encompassed in a motion for a new trial under Rule 33, Fed.R. Crim.P. Metcalf v. United States, 195 F.2d 213 (6th Cir. 1952); Wagner v. United States, 118 F.2d 801 (8th Cir.), cert. denied, 314 U.S. 713, 62 S.Ct. 358, 86 L.Ed. 568 (1941). On the basis of the representations contained in the request to file the proffered motion, we decline to remand the case, but without intimating our view with regard to its merits if the material is brought before the district court through a motion under Rule 33. For the foregoing reasons we deny the request to file the motion.