In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-3481

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

THOMAS BRANDON DAVIS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 04 CR 67—**Sarah Evans Barker**, *Judge.*

ARGUED SEPTEMBER 7, 2006—DECIDED DECEMBER 15, 2006

Before RIPPLE, KANNE, and WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* The defendant was indicted for defrauding Indiana Medicaid. The government's case centered on three independent methods that Davis used to get Indiana Medicaid to pay for procedures that they might not otherwise have paid: he billed for services that were actually provided by other people (substitute-billing), he billed for hours of work that nobody performed (overbilling), and he billed for different procedures in order to avoid pre-authorization requirements (miscoding). A jury returned a general verdict of guilty. On appeal, Davis raises four issues. He challenges two evidentiary rulings, he challenges whether one of the three charged methods of fraud—substitute billing—was actually pro-

hibited, and he challenges the indictment as duplicitous. Because we find no error, we affirm.

## I. HISTORY

Davis is a psychologist who operated two clinics in Indiana. He was licensed as a "health service provider in psychology" (HSPP) and enrolled as a provider under Indiana's Medicaid program. The relationship between Davis and Indiana Medicaid was fruitful: Medicaid soon accounted for the vast majority of his income, and (the indictment alleged) by September 2002 he accounted for more Medicaid spending than any other individual HSPP in the entire state. After an undercover investigation into his billing practices, he was indicted for one count of health care fraud in violation of 18 U.S.C. § 1347.[1]

The indictment alleged that Davis used several methods to entice Indiana Medicaid to pay claims that it would not otherwise have paid. When the state instituted pre-approval requirements for some of his procedures, he would submit claims for different procedures—procedures that required no such pre-authorization. When Davis billed Indiana Medicaid for neuropsychological testing, he would frequently (and contrary to Medicaid billing manuals) bill for a fixed number of hours for a battery of tests, regardless of the number of hours actually consumed by the process. And, central to the dispute between the

---

[1] The statute makes it a crime to "knowingly and willfully execute[ ], or attempt[ ] to execute, a scheme or artifice: . . . (1) to defraud any health care benefit program; or . . . (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services." 18 U.S.C. § 1347.

parties on appeal, Davis would leave much of the administration and perhaps even the interpretation of the psychological tests to clinic staff members with less training than he himself had received—employees who were not licensed psychologists or HSPPs.[2]

At trial, the government provided ample evidence of all three methods of fraud, as well as evidence that could allow a jury to infer willfulness. Among its other evidence, the government introduced the testimony of an expert from Indiana's Office of Medicaid Policy and Planning to the effect that the state of Indiana would not reimburse for services that were actually conducted by unlicensed staff members.

Davis's defense at trial relied almost exclusively on denying that he had a specific intent to defraud. He testified in his own defense that he had believed that all three practices were legal and in keeping with how he had been trained to conduct neuropsychological testing. He called only one other witness, a former employee, to testify about a Medicaid audit that had been conducted in the late 1990s. He unsuccessfully sought to introduce into evidence an unpublished manuscript on neuropsychological testing in order to support his argument that he believed it was good medical practice to use technicians to perform some of the tests. Apparently, the jury did not buy this good faith defense because it returned a general verdict of guilty.

On appeal, Davis raises four issues. He argues that the testimony and jury instructions combined to allow the jury to determine questions of law regarding which

---

[2] As might be expected, the parties differ in how they characterize the extent of this substitute-billing; yet the parties are in agreement that at least *some* parts of *some* procedures were completed by unlicensed staff.

procedures were and were not compensable from Indiana Medicaid. He argues that the "substitute-billing" scheme was not contrary to the law. He argues that the indictment was impermissibly duplicitous and that the duplicity was not corrected by the trial court through adequate jury instructions. Finally, he argues that the district court's decision to exclude his proffered manuscript was an abuse of discretion.

## II. ANALYSIS

### A. *The Legality of Substitute-billing*

Because much of this appeal turns on the question of whether substitute-billing is illegal under Indiana's Medicaid regulations, we address this question first. Whether the Indiana statute allows substitute-billing is a question of law that we consider *de novo*. *United States v. Jones*, 372 F.3d 910, 911-12 (7th Cir. 2004) (citing *Olson v. Risk Mgmt. Alternatives, Inc.*, 366 F.3d 509, 511 (7th Cir. 2004)). Whether a conviction should be reversed when it is claimed for the first time on appeal that the conviction rested on an impermissible ground is a question we review for plain error. *United States v. McKinney*, 954 F.2d 471, 475 (7th Cir. 1995). Davis argues that his substitute-billing scheme falls within a broad reading of the word "provided." The government argues that "provided" must be read to require that the services be "personally" provided by the HSPP.

At the outset, we should note that Davis's defense at trial did not appear to rely in any way on a theory that substitute-billing was actually allowed under Indiana's Medicaid rules. In the instances where the issue arose, it was solely within the context of whether Davis might have *erroneously believed* that the regulations allowed him to do what he did. Tr. 117-19, May 9 (defense opening

statement); Tr. 187, May 9 (redirect of witness Bowen); Tr. 686-88, May 11 (admission of other laws to show whether defendant "believed" that substitute billing is permitted); Tr. 900-01, May 12 (defense closing argument). Generally, issues raised for the first time on appeal are reviewed for plain error. *See United States v. McClellan*, 165 F.3d 535, 551-52 (7th Cir. 1999). "Neither a general objection to the evidence nor a specific objection on other grounds will preserve the issue for review." *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir. 1988) (citing *United States v. Laughlin*, 772 F.2d 1382, 1391-92 (7th Cir. 1985)).

Indiana's rules for Medicaid reimbursement for mental health services are contained in Title 405, Indiana Administrative Code, § 5-20-8. That section states that "Medicaid reimbursement is available for outpatient mental health services provided by psychologists endorsed as a health service provider in psychology (HSPP). Outpatient mental health services rendered by a[n] HSPP are subject to the following limitations." 405 Ind. Admin. Code § 5-20-8 (2002). One of the limitations is: "Subject to prior authorization by the office or its designee, Medicaid will reimburse for neuropsychological and psychological testing when provided by a physician or an HSPP." 405 Ind. Admin. Code § 5-20-8(5) (2002). Davis's claim on appeal is that he "provided" the substitute-billed services that his staff conducted because—even though the tests were administered by other people—he paid the rent and utilities, trained the staff, and acquired the various licenses under which the clinics operated. He urges us to read the word "provided" as synonymous with "furnished." We decline to do so.

Although Davis is accused of committing the federal crime of health care fraud, the allegation turns on whether he executed a "scheme to defraud a health care benefit program." Because the question of whether substitute-

billing is a method to execute a scheme to defraud a health care benefit program depends on which procedures Indiana Medicaid will reimburse, our analysis requires us to interpret Indiana law. The court is unable to locate, and the parties have not pointed us toward, any authority that indicates how Indiana courts have interpreted this statute. It appears to be a question of first impression in this circuit and in the courts of Indiana.

When interpreting statutes, "we give words their plain meaning unless doing so would frustrate the overall purpose of the statutory scheme, lead to absurd results, or contravene clearly expressed legislative intent." *United States v. Vallery*, 437 F.3d 626, 630 (7th Cir. 2006). In this case, the plain meaning of the words—that "Medicaid will reimburse for . . . testing when provided by . . . an HSPP"—is that the HSPP must be the person who is actually engaged in the conduct of performing the tests. Any other reading would "lead to absurd results." *Id.* The logic of the argument made on appeal would have allowed Davis to pre-pay the rent, license the tests, staff the clinics with minimum wage technicians, and then fly to a tropical paradise[3] and watch the money flow in. He would, arguably, still be "providing" the services that Medicaid was buying from him, if "providing" were simply a synonym for "furnishing." This cannot be the plain meaning of the statute.

Even if the plain meaning of the statute were not clear, we are convinced that a thorough reading of the requirement in the context of the rest of the Medicaid reimbursement statute supports this conclusion. The

---

[3] Or, perhaps, less tropical Canada—his country of birth. The indictment alleged that he billed Medicaid for at least $11,745 worth of services while he was in Vancouver in the Summer of 2002.

Indiana legislature has demonstrated that when it chooses to allow so-called "mid-level practitioners" to perform some of the tasks that are billed by a supervising provider it knows how to make this clear in the law. In the context of outpatient psychotherapy, the state specifies various types of mental health workers who may render billable services under the direct supervision of a psychiatrist. *See* Ind. Admin. Code § 5-20-8(2) (2002). This rule does not help Davis. Billing for the services of mid-level practitioners in outpatient psychotherapy is subject to pre-approval by Medicaid, and the range of allowable mid-level practitioners recognized in § 5-20-8(2) are all vastly more qualified than the employees that Davis had hired and trained to administer the tests in his clinic.[4] *Id.*

Davis also asks this court to read the presence of the word "directly" found in Medicaid regulations for *physicians* at 405 Ind. Admin. Code § 5-25-1 (2006) and the absence of such a modifier from the *psychologists'* regulations to imply a legislative intent to allow psychologists the freedom to bill for psychological testing that was conducted by unlicensed staff. This we are not willing to do, because it would not only require that we equate the words "directly" and "personally" but would also require that we assume that the legislative intent behind a portion of the statute governing Medicaid billing

---

[4]  The mid-level practitioners who are specifically listed as being allowed to practice in outpatient psychotherapy are: licensed psychologists, licensed independent practice school psychologists, licensed clinical social workers, licensed marital and family therapists, licensed mental health counselors, and persons holding a master's degree in social work, marital and family therapy, or mental health counseling. 405 Ind. Admin. Code § 5-20-8(2) (2002).

by physicians must be the same as the legislative intent behind the regulations for psychologists.

In sum, in the face of plain language that allowed Davis to bill for only those testing services that he, as an HSPP, provided to the patients, we find nothing to suggest that Indiana intended him to use college students to do the lion's share of his work while still billing Medicaid as if he had performed the tests himself. In those few instances where Indiana is willing to allow mental health services to be administered by third-parties under the direct supervision of the HSPP or physician, Indiana made it clear that such billing was allowed, required that such a billing procedure be approved ahead of time, and restricted it to particular licensed mental health professionals. 405 Ind. Admin. Code § 5-20-8(2) (2002).

Because we find as a matter of law that the conviction could not have rested on an impermissible ground, there was no error to be examined under plain error review. *See United States v. Donaby*, 349 F.3d 1046, 1049 (7th Cir. 2003).

## B. The Admission of the Expert Testimony

We turn to the evidentiary errors that Davis ascribes to the trial court. Davis argues that it was reversible error for the trial court to allow, over defense counsel objection, the admission into evidence of the testimony of Kathy Bowen, who was an employee of Indiana Medicaid and an expert in reimbursement for mental health services. We review the trial court's decision to admit expert testimony for abuse of discretion. *Kempner Mobile Elec., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 712 (7th Cir. 2005). Legal conclusions made by the trial court in reaching the decision to admit expert testimony are reviewed *de novo. Id.*

In relevant part, the direct examination of Ms. Bowen proceeded:

> Q: And how does the Indiana Medicaid program interpret whether the HSPP has to personally perform this service?
>
>  . . .
>
> Q: Must the HSPP personally perform the service?
>
> A: Yes. And I say yes because it says—it lists services that are reimbursed when provided by a psychologist endorsed as an HSPP, and that is our intent, and it's the policy that we have shared with the providers.

Tr. 188, May 9.

The defense had objected to Ms. Bowen's testimony. After establishing that the expert had never had a conversation with the defendant about this provision of the law (apparently to support the defense argument that Dr. Davis had a good faith belief that his activities were legal) defense counsel entered "a continuing objection . . . to witnesses, such as this one, interpreting laws. I think it invades the province of the jury. That's for the jury to determine what the law says and whether or not this law was broken." Tr. 187, May 9. The court corrected defense counsel:

> I understand your objection, but it's got an erroneous premise because the witness is not going to testify to what the law means. I instruct on the meaning of the law, but she can testify to how it's enforced, how it's interpreted, how it's distributed to people in the form of manuals and so forth.

Tr. 187, May 9.

Experts are permitted to testify regarding how their government agency applies rules as long as the testimony does not incorrectly state the law or opine on certain ultimate legal issues in the case. Fed. R. Evid. 704; *United*

*States v. Turner*, 400 F.3d 491, 499 (7th Cir. 2005). For example, we have held that expert testimony is allowed to the effect that financial transactions did not comply with regulations and appeared to be fraudulent. *United States v. Owens*, 301 F.3d 521, 526-27 (7th Cir. 2002) (noting that Fed. R. Evid. 704 partially displaces the "old ultimate issue rule" in a case such as this where the only major issue at trial was the mental state of the defendant).

There are cases where such expert witness testimony would be an abuse of discretion under the Rules of Evidence for being more prejudicial than probative. Fed R. Evid. 401, 403. This is not such a case. Davis cites to *Bammerlin v. Navistar Int'l Transp. Corp.*, where we held it an abuse of discretion to allow a "battle of the experts" to opine about whether a seat belt assembly passed federal safety standards when the experts were unable to even agree on what the applicable laws were. 30 F.3d 898, 900-01 (7th Cir. 1994). True, when two competing experts offer differing opinions that are based on fact and law, the jury should not be left adrift to consider the credibility of the experts to come to a conclusion about the law. But this is not the case here. We have held before, and hold today, that experts are allowed to testify about how they enforce regulations, whether transactions comply with regulations, and how they ensure that the public knows about regulations. Admission of this testimony was not error, and therefore was not an abuse of discretion.

## C. *The Exclusion of the Unpublished Manuscript*

The defendant also challenges the district court's decision to exclude an unpublished manuscript from the evidence. As with the testimony above, we review for abuse of discretion. *United States v. Gant*, 396 F.3d 906, 908 (7th Cir. 2005). We find that the district court did not abuse

its discretion in excluding the evidence, although we base that decision on reasons other than those cited by the district court. *See United States v. Fazzini*, 871 F.2d 635, 639-40 (7th Cir. 1989).

The proffered document appears to be a photocopied course-pack from a psychology class during the Winter of 1987 to 1988 entitled "Manual for the Administration of Neuropsychological Test Batteries for Adults and Children, Norms." The title page credits Dr. Ralph M. Reitan as the author, and indicates that it was being used in a course taught by somebody named "Fischer". Dr. Davis argues that the course-pack was vital to his defense, because it supported that he did not have the requisite *mens rea*—his ultimate defense. Specifically, he argued at the time that he intended to use the manuscript to show that he thought it was the best psychological practice to use other people to conduct his tests. The question of whether "*substitute-testing*"—for lack of a better term—is advisable for medical reasons is irrelevant to the question of whether *substitute-billing* of Medicaid is illegal. Fed. R. Evid. 701. Likewise, evidence that tends to prove or disprove whether the defendant believed that substitute-testing was advisable is irrelevant to whether the defendant believed that he could bill Medicaid for the procedure. There are presumably plenty of good ways to practice medicine that Indiana will choose not to reimburse through the Medicaid program. This appears to be one of them.

The exclusion of the course-pack would also be within the discretion of the district judge purely on the grounds of reliability. A photocopied, unsigned, fifteen-year-old report could have been misinterpreted by the jury to imply that this was some sort of learned treatise or standard of care within the field. The court allowed Davis to testify as to his belief that he had been trained to use technicians for the tests and this accomplished what he had hoped for by

offering the manuscript into evidence. This balancing of the probative and prejudicial nature of the evidence does not rise to the level of an abuse of discretion. We find no error.

### D. *The Duplicity of the Indictment*

Davis also argues that the indictment is impermissibly duplicitous and that the duplicity was not adequately corrected by the trial court. We review a challenge to an indictment that was not preserved by objection before trial for plain error. *United States v. Hammen*, 977 F.2d 379, 382 (7th Cir. 1992).

An indictment that charges more than one offense in a single count is duplicitous. Fed. R. Crim. P. 8(a); *United States v. Tanner*, 471 F.2d 128, 138 (7th Cir. 1972). An indictment is not duplicitous if it charges a single offense carried out through many different means. *United States v. Berardi*, 675 F.2d 894, 897-98 (7th Cir. 1982). The dangers of a duplicitous indictment are that the defendant may not understand the charges against him, might be convicted by less than a unanimous jury, may be prejudiced by evidentiary rulings at trial, or may be subjected to double jeopardy. *Id.* at 899.

The indictment alleged a single count of health care fraud. It specified that the count was carried out through three separate schemes, and that each of those schemes was carried out on numerous occasions. Davis is correct that an indictment can be duplicitous if numerous discrete instances of criminal conduct are lumped into a single count. Such was the case in *Tanner*, where the indictment alleged several instances of criminal conduct, involving multiple defendants, multiple locations, and multiple dates. *Tanner*, 471 F.2d at 138-39. But contrary to Davis's argument, this is not an absolute rule. Where

the indictment "fairly interpreted" alleges a "continuing course of conduct, during a discrete period of time," the indictment is not prejudicially duplicitous. *Berardi*, 675 F.2d at 898. "The line between multiple offenses and multiple means to the commission of a single continuing offense is often a difficult one to draw. The decision is left, at least initially, to the discretion of the prosecution." *Id.* (citing *Tanner*, 471 F.2d at 138).

We are convinced that this indictment, fairly interpreted, is closer to *Berardi* than *Tanner*. The indictment sets out an ongoing and continuous course of conduct, accomplished through three different methods, that were repeated on numerous (likely daily) occasions over several years. The indictment alleges only one crime: health care fraud. Unlike the indictment at issue in *Tanner*, the crime charged here was fairly straightforward, involved only one defendant, one victim, and one criminal statute. It seems that the prosecution's decision to charge only one count falls well within its discretion as explained in *Berardi*, and that the dangers otherwise inherent in duplicitous indictments are not present here. If the indictment confused the defendant, the proper time to raise that objection was before trial, allowing the court an opportunity to correct the error and allowing the government to seek a superceding indictment. If the indictment raised the specter of double jeopardy, the defendant has made no such claim on appeal. Because, as we held above, the challenged evidentiary decisions were correct, there is no danger that the alleged duplicity led to prejudicial evidentiary decisions.

All that remains is the defendant's argument that the indictment, coupled with inadequate jury instructions, allowed him to be convicted by less than a unanimous jury. The defense would prefer that the instructions had specified that the jury needed to unanimously agree on a specific execution of the scheme. This argument was

not made at trial. In fact, defense counsel affirmatively endorsed the jury instructions. Tr. 970-72, May 12. We review jury instructions as a whole and as long as they fairly and adequately represent the issues we will not interfere with them on appeal. *See United States v. Patrick*, 542 F.2d 381, 389 (7th Cir. 1976). We review forfeited arguments regarding jury instructions for plain error. *See United States v. Suggs*, 374 F.3d 508, 517-18 (7th Cir. 2004).

Taking the jury instructions as a whole, the instructions fairly and adequately represented the issues and informed the jury that they must unanimously find at least one scheme proved beyond a reasonable doubt. Jury Instruction 8 clearly spelled out the elements of the alleged crime and informed the jury that it must find every element proved beyond a reasonable doubt. Jury Instruction 31 informed the jury that it must be unanimous if it found the defendant guilty. Jury Instruction 13 informed the jury that the government need not prove every scheme that it had alleged, but that it must prove one of them beyond a reasonable doubt. Taken in context, the jury was adequately informed of the need for unanimity and that all elements—and at least one scheme—be proved beyond a reasonable doubt. The jury instructions and the inclusion of multiple schemes in a single count did not deprive the defendant of a unanimous jury.

## III. CONCLUSION

For the foregoing reasons, the conviction is AFFIRMED.

No. 05-3481                                                        15

A true Copy:

    Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
