UNITED STATES of America, Plaintiff,

v.

PHILLIPS PETROLEUM COMPANY, Stanley Learned, William F. Martin, William W. Keeler, Defendants.

Cr. No. 76–CR–117–B.

United States District Court, N. D. Oklahoma.

July 5, 1977.

See also 435 F.Supp. 610.

Jack Cotton, David V. Capes, Thomas M. Atkinson, Dept. of Justice, Tax Division, Washington, D. C., Charles J. Muller, III,* Asst. U. S. Atty., San Antonio, Tex., for U. S.

Boris Kostelanetz, John J. Tigue, Jr., Lawrence S. Feld, Kostelanetz & Ritholz, New York City, L. K. Smith, Reuben Davis, Boone, Ellison & Smith, Tulsa, Okl., Edward J. Fauss, Phillips Pet. Co., Bartlesville, Okl., for Phillips Pet. Co.

John M. Imel, Donald P. Moyers, Tulsa, Okl., for Stanley Learned.

Edward Bennett Williams, John L. Vardaman, Jr., Washington, D. C., for William F. Martin.

Richard B. McDermott, David McKinney, Boesche, McDermott & Eskridge, Tulsa, Okl., for William W. Keeler.

FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO DEFENDANTS' MOTION TO DISMISS COUNT ONE

BARROW, Chief Judge.

The Court having heard the arguments of counsel on the Motion to Dismiss Count I for Breach of the Plea Agreement, and the parties having submitted their briefs, the Court, having carefully perused the entire file, makes the following Findings of Fact and Conclusions of Law:

* Formerly Chief Counsel, later became Asst. U. S. Atty. However, Mr. Muller is no longer with the Dept. of Justice . . . he is in private practice of law.

## FINDINGS OF FACT

1. On September 2, 1976, an indictment was filed in this Court, Case No. 76–CR–117, and naming as defendants Phillips Petroleum Company, Stanley Learned, William F. Martin, and William W. Keeler.

2. Count I charges the four defendants with a conspiracy in violation of 18 U.S.C. § 371 alleged to have existed from on or about January 1, 1962 and continuously thereafter to October 5, 1973, in that the defendants together with Phillips International Corporation, an unindicted co-conspirator and other persons, did unlawfully, knowingly, and willfully conspire, combine, confederate and agree together to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of the corporate income taxes of Phillips Petroleum Company. It is alleged in Count I that Phillips would and did enter into agreements whereby over $2,600,000 would be generated in a concealed and confidential manner and would not be properly recorded on Phillips' books of financial account, nor recorded as income on its income tax returns; that the funds were concealed in Swiss bank accounts; and disbursements of moneys of Phillips would be made to certain foreign associates of Phillips and not be properly recorded on the books of financial account; that funds from Swiss accounts would be withdrawn in cash from time to time and returned to Phillips' headquarters in Bartlesville, Oklahoma, where said funds would be held in a confidential cash fund used to make concealed payments which would not be properly recorded on Phillips' books of financial account; that Phillips would cause certain fees of Phillips to be transmitted to Phillips Petroleum International Corporation, where it would be available for confidential disbursements to certain foreign entities and other uses and would not properly be recorded on Phillips' books of financial account; and that Phillips would do various acts to conceal from the Internal Revenue Service the true nature of Phillips' income and expenses and prevent the IRS from making a complete and accurate audit of Phillips' books and records for income tax purposes.

3. On November 11, 1976, defendants Phillips and Martin moved to dismiss Count I of the indictment on the grounds that the charge in Count I "constitutes an impermissible breach of an agreement entered into between the government, Phillips Petroleum Company, on behalf of itself, its present and former officers, agents and employees and W. W. Keeler, whereby all potential liablility for the conspiratorial agreement charged in Count I was fully discharged." [Phillips and Martin Motion to Dismiss Count I, filed November 11, 1976]

4. In support of this motion, defendants Phillips and Martin contend that "in mid-1973 Phillips and Keeler responded to a public invitation from Archibald Cox, the then Watergate Special Prosecutor, and voluntarily disclosed a $100,000 corporate contribution to the presidential campaign of former President Nixon. Additionally, Phillips and Keeler disclosed a practice of making corporate contributions over many years as well as the manner in which the funds used to make the contributions were generated. The disclosures to the Special Prosecutor culminated in a plea bargain pursuant to which Phillips and Keeler each pled guilty to one misdemeanor violation of 18 U.S.C. § 610 and the Special Prosecutor agreed that there would be no further prosecutions for any Title 18 violations arising from the contributions and the information voluntarily disclosed. The government now proceeds on Count I in direct contravention of that agreement." [Phillips and Martin Memorandum of Points and Authorities in Support of Motion to Dismiss, filed November 11, 1976, at 1–2]

5. All other defendants have joined in the Motion to Dismiss Count I.

6. At the pre-trial conference had on January 5, 1977, counsel for the defendants summarized their position in the following manner:

MR. WILLIAMS: Our position, and there is no secret about it, Your Honor, is that

stripped down to its essence it was when this disposition was made by the Company, and by Mr. Keeler, that there would be nothing that could ever be brought against the Company or its officers thereafter, except a Title 26 violation, that Title 18 was out. That is the bottom line of our position and that was violated when they brought a conspiracy count which throws into the case all of the things which were disposed of with the Watergate prosecutor; and in reliance on that agreement, Your Honor, the Company and its officers made a full and total disclosure, which they never would have done if they believed they were going to walk into a Title 18 violation.

[Proceedings of January 5, 1977, Tr. 49]

7. In response to the above statement, counsel for the Government stated:

MR. ATKINSON: . . . when you have a basic disagreement over the facts of what transpired in the Watergate Special Prosecutor's Office, I think this Court is entitled to hear from the ex-members of that staff who are now out and scattered all over.

. . . I think the lawyers' interpretation of what was said at those meetings is going to differ more than anything else . . .

[Proceedings of January 5, 1977, Tr. 50–51]

8. Further comment was made by defendant Keeler at this same conference:

THE COURT: What did they say to you and who was it?

MR. KEELER: They, as I recall, and I am not sure of the man's name.

MR. McDERMOTT: McBride.

MR. KEELER: McBride. Mr. McBride explained that you understand this now, that if you go ahead and sign the information that this is this, this, this and this, and you come before the Court and present yourself, that we are going to, if you do this, then this will close the case once and for all. Now, as far as I am

concerned this is—I don't mean to get Indian history in here, but this is, you are bringing up something that is the United States not keeping their treaty.**

[Proceedings of January 5, 1977, Tr. 55]

9. To determine exactly what the "agreement" was between Phillips and Keeler and the Watergate Special Prosecutor, this Court held an evidentiary hearing on February 17–18, 1977. Testimony was given by Thomas Dunn Finney, Jr., Esquire, retained counsel for Phillips and its officers, with the Washington, D. C. firm of Clifford, Warnke, Glass, McIlwain and Finney; Thomas F. McBride, Associate Watergate Prosecutor from May 1973 to September 1975 [Proceedings of February 18, 1977, Tr. 406]; and Roger M. Witten and James Quarles, associates of Mr. McBride at the Watergate Special Prosecutor's Office [Proceedings of February 18, 1977, Tr. 359 and 368–70].

10. At the hearings of February 17–18, 1977, the Court received into evidence, among other exhibits, Defendants' Exhibit 9, which is the same as the Appendices filed by the Government to its Response to Replies of All Defendants in Support of Their Pre-trial Motions, filed January 24, 1977. [Proceedings of February 17, 1977, Tr. 323–28]. For the sake of brevity, all references to these exhibits will be to "Deft. Exh. 9".

11. On April 13, 1977, this Court entered an Order deferring its ruling on this Motion until trial of the general issue.

12. On May 11, 1977, the Court granted Defendants' Motion for Reconsideration, and heard further argument on the Motion to Dismiss Count I for Breach of a Plea Agreement.

13. Based upon the testimony of the witnesses taken on February 17–18, 1977, and the Exhibits received into evidence on those same dates, this Court finds the following to be the sequence of events leading up to and surrounding the Plea Agreement between Phillips and Keeler and the Watergate Special Prosecutor.

---

** Parenthetically, it should be noted that Mr. Keeler, in addition to being CEO of Phillips, served as Principal Chief of the Cherokee Nation, one of the five Civilized Tribes, from 1949 to 1975.

14. The Court takes judicial notice of the fact that a Watergate Special Prosecution Force (WSPF) was established in 1973 within the Department of Justice; and of the fact that the WSPF had jurisdiction to investigate and prosecute offenses arising out of the 1972 presidential election.

15. The Campaign Contributions Task Force of the WSPF was headed by Associate Special Prosecutor Thomas McBride, and among his assistants were Roger Witten and James Quarles. [Proceedings of February 18, 1977, Tr. 406–07; 359; 368–70].

16. On July 6, 1973, Special Prosecutor Archibald Cox issued a statement for immediate release, announcing that American Airlines had voluntarily acknowledged illegal corporate contributions to the Committee to Re-Elect the President (CREEP) in 1971–72, and that American Airlines had agreed to cooperate fully with the WSPF office. What Mr. Cox stated in that release is worthy of note:

> "Mr. Cox noted that the Federal Election Laws, specifically Section 610 of the Federal Criminal Code, forbid corporate contributions to political campaigns and that campaign committees, campaign officials, corporations, and also individual corporate officers violate 18 U.S.C. § 610 when such a contribution is made. He added, 'We are not adopting any blanket policy towards either corporations or individual officers; but *it is fair to say that when corporate officers came forward voluntarily and early to disclose illegal political contributions to candidates of either party, their voluntary acknowledgement will be considered as a mitigating circumstance in deciding what charges to bring.'*
>
> . . . Mr. Cox commended the forthright action of American Airlines executives and expressed the hope that other responsible corporate executives would also realize the damage created by illegal campaign financing and come forward like American Airlines in an effort to put an end to such practices . . ."
> (Deft. Exh. 10).

17. On July 19, 1973, William W. Keeler "consulted Phillips' general counsel [Lloyd Minter] and revealed that Keeler had used corporate money" to make contributions in the amount of $100,000 to the Finance Committee to Re-Elect the President (FCREEP). [Deft. Exh. 9, B–2 at 5].

18. Mr. Minter, acting at the direction of William F. Martin, the Chief Executive Officer of Phillips as of January, 1973, contacted Finney in the latter part of July, 1973, and asked Mr. Finney "to review certain information that had come to the attention of the general counsel and the chief executive officer, with respect to a contribution that had been made to the Finance Committee to Re-Elect the President by Mr. Keeler, to investigate the circumstances of that contribution, make recommendations to the Board of Directors of Phillips with respect to what the company should do regarding it." [Proceedings of February 17, 1977, Tr. 249; 293].

19. Between this initial contact and August 13, 1973, Mr. Finney conducted "a preliminary investigation" into the matter of the contribution which Mr. Keeler had made to FCREEP, and interviewed Mr. John Houchin, Mr. William Keeler, and Mr. William Martin. [Proceedings of February 17, 1977, Tr. 269–70].

20. On August 13, 1973, there was a meeting of the Board of Directors of Phillips at which Mr. Thomas Finney, Jr. was present. The minutes of that meeting reflect that Mr. Finney was directed by the Board to investigate and reveal the contribution, and the Board unanimously determined that Phillips would voluntarily come forward and disclose the contribution to the Government. [Govt. Exh. D–3]. This policy decision was pursuant to the announcement of Archibald Cox on July 6, 1973. [Proceedings of February 17, 1977, Tr. 293–94].

21. As a result of this Board meeting, the policy adopted by the Board of Phillips, in the words of Mr. Finney, was essentially:

> ". . . that the fact of the contribution to the Nixon Campaign of Corporate funds would be disclosed to the Special

Prosecutor immediately, that an investigation had been only briefly undertaken, would be continued to try to get a complete knowledge of the facts and circumstances surrounding both the contribution and the fund, that disclosure would be made specifically at an early date to the Internal Revenue Service as soon as we had sufficient facts to do so, and that we would cooperate with other Government agencies as the occasion arose." [Proceedings of February 17, 1977, Tr. 293].

22. In making his report of the results of his preliminary investigation to the Board of Directors on August 13, 1977, Mr. Finney informed the Board of the existence of a cash fund in the Phillips offices in Bartlesville, Oklahoma—approximately $703,000—in the safe of Mr. Houchin. [Proceedings of February 17, 1977, Tr. 271].

23. On or about August 14 or 15, 1977, this money, and a separate cash fund in the amount of approximately $60,000 which had been in the safe in Mr. Martin's office, was delivered to the treasurer and comptroller of Phillips, entered on the books and "deposited appropriately". [Proceedings of February 17, 1977, Tr. 271–72].

24. On August 15, 1973, Finney met with Associate Special Prosecutor McBride and disclosed to Mr. McBride the specific contribution involved. [Proceedings of February 17–18, 1977, Tr. 250; 409]. Special Prosecutor McBride gave Mr. Finney a list of questions that should be investigated as to the source of the funds. [Proceedings of February 17–18, 1977, Tr. 298; 301; 410]. Finney testified regarding this August 15, 1977, meeting as follows:

"When I first talked to Mr. McBride, I advised him that in addition to the instruction that I had to report the contribution to the Special Prosecutor, that I had been instructed by the Board to continue the investigation of the circumstances surrounding that contribution and I proposed to him that if the Special Prosecutor's office would, in effect, defer any independent inquiry or would permit me to do it in this way, that I would try

to get the facts and would report them to him. I did that, I tried to develop in the investigation and provide Mr. McBride with information that was responsive to the questions that he had asked me; . . . ." [Proceedings of February 17, 1977, Tr. 251]

25. Between August 15, 1973, and December 4, 1973, Mr. Finney had a series of meetings with Mr. McBride (approximately nine), and had a number of telephone conversations with Mr. McBride and members of his staff. [Proceedings of February 17–18, 1977, Tr. 250; 407].

26. Between August 16, 1973, and October 17, 1973, the Campaign Contributions Task Force of the WSPF was developing its policy for handling the 18 U.S.C. § 610 violations which the Force was investigating. WSPF memoranda of August 16, September 6 and September 11, 1973, show that Phillips voluntarily disclosed its large cash contributions, and set forth the recommendations of the Force for dealing with violators. [Deft. Exh. 9, C–1; C–2; C–3].

27. The Task Force recommendations on prosecutive policy were adopted on October 8, 1973, at a meeting of Watergate Special Prosecutor Archibald Cox, Deputy Prosecutor Henry Ruth, and members of the Campaign Contributions Task Force [Deft. Exh. 9, C–4].

28. On October 10, 1973, Mr. Finney met with Mr. McBride and his associate Roger M. Witten, at which time "Finney described the facts surrounding Phillips' $100,000 corporate contribution to FCREEP." [Deft. Exh. 9, B–2]. The Court hereby incorporates by reference the six pages of the memorandum of this meeting prepared by Mr. Witten, which describes in detail the facts surrounding the solicitation of this contribution by Maurice Stans, the head of FCREEP, the two contributions made by Mr. Keeler to FCREEP, *and the source, generation and mechanics of the cash funds.* [Deft. Exh. 9, B–2].

29. Mr. Finney testified that, as to the disclosures made regarding the source of

the funds, either at or subsequent to this October 10, 1973, meeting, Mr. McBride was aware of the following facts:

". . . I can tell you approximately or I can tell you the things that I told Mr. McBride about the origin of the funds. I know that he was aware that the funds had been generated in foreign commercial transactions of Phillips initially. I know he was aware, I know that I told him that funds were diverted into Swiss accounts which were the accounts of Swiss corporations. I know that he was aware that from those accounts money was taken from time to time and returned to the United States in cash. I know that he was aware that that cash was kept in Mr. Houchin's possession in Bartlesville. [See Finding No. 40]. I know he was aware that it was used for the making of political contributions, *and I know that he was aware that it was not entered on the books of the Company, and that therefore we had tax problems with respect to it.*"

[Proceedings of February 17, 1977, Tr. 275–76, (emphasis supplied)].

30. At the October 10, 1973, meeting, Mr. McBride "advised Finney that we wanted more information about the source and mechanics of the cash fund to determine if Phillips committed related IRS offenses." [Deft. Exh. 9, B–2 at 6].

31. During the course of the discussions between Finney and McBride from August through December, 1973, Finney told McBride that the funds had not been entered on the books of Phillips. During the testimony of Mr. Finney on February 17, 1977, the following colloquy took place:

"Q. (by Mr. Cotton, Government attorney) But it's your impression that when you told him the money had not been entered on the books of the Corporation that it had reference to the two million dollars in the Swiss bank account in 1964 or to the political contribution?

A. (by Mr. Finney) The specific context of the comment was that the cash that had been maintained in Bartlesville had not been entered on the books of the Company.

Q. All right. Thank you very much.

THE COURT: Excuse me a moment. When did you say the specific statement was made there, Tom?

THE WITNESS: I can't be exact about the date on which it occurred. I think that—my recollection is that the first sort of substantive conversation of any length that I had with Tom McBride was on the 10th of October because there was a period of, a considerable period between my first session with him and the time that I came back and made a rather full report of the circumstances surrounding the contribution, so that it is likely that this occurred either on the 10th of October or at one of the conferences after that. I met with him nine times and I can't be positive at which meeting the discussions which I recall took place. I would think it is likely that that took place on the 10th, but I can't be positive.

THE COURT: That is understandable, but all of this information though that you testified to on direct was available to him through you or other sources prior to the plea?

THE WITNESS: Oh, yes, sir, yes, sir.

THE COURT: Very well.

THE WITNESS: All prior to the 10th. And as a matter of fact the—I am certain that the discussion of this kind of thing, the source of the funds, how it was generated, who was involved, those discussions were likely to have taken place in October and early November. Now they were treated again in the interviews. There were questions asked in the interviews that in some instances bore on this, but that was all prior to the plea."

[Proceedings of February 17, 1977, Tr. 277–79].

32. At the conclusion of the October 10, 1973 meeting, Mr. Finney was advised by the Special Prosecutor as to the disposition that his office would make as to the Phillips disclosure. [Proceedings of February 17, 1977, Tr. 252]. Mr. Finney's recollection of the agreement as to disposition, which was made between McBride, Finney on behalf

of Phillips and Keeler, and Keeler was as follows:

". . . by mid-October, the Prosecutor's policy had been developed and we agreed at that time that in view of the fact that there was no suggestion that there was any particular quid pro quo attached to the Phillips' contribution but had simply been a contribution in a response to fairly vigorous solicitation by the Finance Committee to Re-Elect the President; that the Company would be charged with a misdemeanor violation, a single violation of Section 610; that Mr. Keeler, as the responsible officer, chief executive officer at the time the contribution was made, would be charged with a single misdemeanor violation of Section 610; that the Court would be advised that Phillips and Mr. Keeler had come forward voluntarily prior to the time that any inquiry had been instituted by the Special Prosecutor, that advice being given at the time of sentencing; *that this would be in discharge or in satisfaction of all criminal charges rising out of this pattern of conduct that we were dealing.*

Now, that understanding was subject to an exception and to a condition. *The exception was that the proposed plea of guilty by Mr. Keeler and the Company would not bar either civil or criminal prosecution or proceedings for violations of the Tax Code* and it was subject to the condition or our continued cooperation with the Special Prosecutor until the time of sentencing."
[Proceedings of February 17, 1977, Tr. 253–54, (emphasis supplied)].

33. In addition, two aspects of the condition to the agreement were specified on October 10, 1973: that Phillips would disclose to the Special Prosecutor, to the extent possible, all contributions in Federal elections that were not barred by the Statute of Limitations, and that it would make available to the staff of the Special Prosecutor such of the officers, employees, directors of Phillips as they desired to interview. [Proceedings of February 17, 1977, Tr. 254].

34. On October 17, 1973, Special Prosecutor Archibald Cox issued a statement "announcing a general policy toward violators of 18 U.S.C. § 610, the law prohibiting corporate contributions in connection with Federal elections." [Deft. Exh. 11 at 1]. That policy was, even in cases where the Company voluntarily came forward, to charge the primarily responsible corporate officer with the misdemeanor violation of 18 U.S.C. § 610, as well as charging the Corporation. [Deft. Exh. 11 at 2].

35. On October 18, 1973, Finney sent a letter to McBride stating, in essence, two things: that Finney would check with McBride upon Finney's return from California regarding two questions which McBride was going to discuss with Mr. Cox, and that Finney had "set some inquiries in motion" and would "provide some further information" shortly upon his return. [Deft. Exh. 9, B–3].

36. McBride's handwritten notations on the bottom of that October 18 letter indicate that McBride talked to Finney on November 5, 1973, and the following matters were discussed:
"1) told him no rec. re jail/fine— 2) must have disclosure of all 610's w/in statute 3) get Keeler in here 4) other info. fr. Keeler?—"
[Deft. Exh. 9, B–3].

37. Pursuant to McBride's request for "disclosure of all 610's w/in statute", on November 9, 1973, Finney disclosed to McBride
"that in 1970 approximately $23,000 in contributions had been made to 29 candidates for House or Senate . . . that in 1972 approximately $27,800 had been contributed to 36 candidates for House and Senate seats . . . that contributions totalling about $10,000 were made to . . . an unsuccessful candidate for the Senate from Oklahoma, in either 1970 or 1972 . . . [that] these contributions were all made in cash and usually delivered by Carstens Slack and usually the candidates were told that the contribution came 'from yours friends at Phillips'. [Deft. Exh. 9, B–13]."

McBride told Finney that he would have to have "either the original records or a reconstructed list of persons to whom these contributions were made." [Deft. Exh. 9, B–13]. That list was later furnished to McBride. [Deft. Exh. 9, B–13; Proceedings of February 18, 1977, Tr. 410].

38. On November 12, 1973, pursuant to the request of McBride, McBride and his assistant James Quarles interviewed Keeler. The notes and memoranda of Quarles concerning the Keeler interview indicate that Keeler described the 1968 and 1972 contributions and the facts and circumstances surrounding them, but that Keeler stated "that he did not know at that time and does not to this day know precisely, how the funds . . . were generated." [Deft. Exh. 9, B–5 at 1–2]. The memorandum of November 20, 1973, prepared by James Quarles regarding this November 12 meeting, indicates that "Mr. Keeler was then excused and a discussion took place between Mr. McBride and Mr. Finney. Mr. Finney stated that he had undertaken an investigation as to the source of the funds used in the contributions. It was decided that this office had no independent interest in learning the source of those funds since complete disclosure had been made to the Internal Revenue Services' Oklahoma Headquarters." [Deft. Exh. 9, B–6 at 6].

39. On November 28, 1973, McBride and Quarles interviewed Carstens Slack, the Washington representative of Phillips, who was also Vice-President of Phillips. Slack recounted to McBride and Quarles the facts surrounding the Phillips contributions and that ". . . the money for the congressional contributions was picked up in Bartlesville from Houchin, although occasionally Houchin would bring the cash to D.C.

. . .

Slack disclaimed any attempt to influence any governmental action by the $100,000 contribution." [Deft. Exh. 9, B–8 at 3].

40. On December 3, 1973, McBride and Quarles interviewed John Houchin, who became the Chairman of the Executive Committee of Phillips in 1968, became President of Phillips in late 1968 and so remained

until 1971, at which time he became Deputy Chairman of Phillips, and in 1973, he became Chairman of Phillips. Houchin stated, regarding the source of the funds, that the "money came from a foreign (Swiss) account in which a major deposit had been made in 1964. The account was in the name of a subsidiary of Phillips Petroleum." [Deft. Exh. 9, B–10 at 2].

41. It was the office policy of the Watergate Special Prosecution Force, in cases that they were investigating, to prepare prosecutive memoranda prior to the acceptance of a plea or the return of an indictment. [Proceedings of February 18, 1977, Tr. 373]. Mr. Quarles stated that these memoranda were:

"designed to formally acquaint the individual who would have the ultimate decision-making power of both the facts, as we understood them, to indicate the law, as we understood it, and in a case in which it was likely to be a disputed matter, that is a case in which no plea was expected but an indictment was expected, to summarize the proof which the Government expected to be able to elicit in competent form in the courtroom. And the major purpose of it was to insure that the person who had the ultimate responsibility of deciding, had some formal basis upon which to make his decision."

[Proceedings of February 18, 1977, Tr. 373].

42. On December 3, 1973, James Quarles prepared, pursuant to the instructions of Mr. McBride, the draft of the Phillips prosecutive memorandum, after having reviewed the file which the WSPF kept on Phillips. Quarles testified that the draft prepared by him incorporated his understanding of an agreement previously reached by McBride and Finney. [Proceedings of February 18, 1977, Tr. 374–75; Deft. Exh. 9, B–11].

43. Quarles also testified that the initial draft of this memorandum was prepared before the interview of John Houchin on December 3, 1973. After this interview, Quarles rewrote a portion of the draft of the memorandum to read:

"B. *Source of Corporate Cash.* The mechanics of raising the cash for the contributions has been disclosed to the IRS. Briefly stated, John Houchen [sic] maintained $100,000 plus in a safe in his office for the use in making political contributions. The source of the funds was an account maintained by Phillips in a bank in Switzerland, the funds of which were generated by a large cash deposit of Phillips' funds in 1964."

[Deft. Exh. 9, B–11 at 8, Proceedings of February 18, 1977, Tr. 380–81]

44. The final version of the prosecutive memorandum was prepared by Thomas McBride, and approved by Henry S. Ruth and Leon Jaworski, of the WSPF, on December 3, 1973. [Deft. Exh. 9, B–12 cover sheet]. In the final version, the rewritten version of "Source of Corporate Cash" was included [Deft. Exh. 9, B–12 at 3; see Finding No. 43], and under the section captioned "Law", the memorandum states the following with regard to possible charges which could be brought, and the charges which should be brought:

"As a matter of law, and with the testimony we now possess as a matter of proof, it is possible to charge Keeler, Houchin and Slack each with two count felony violations of 18 U.S.C. 610 and/or a conspiracy to violate 18 U.S.C. § 371. However, consistent with the announced policy of the Special Prosecutor toward 'early and voluntary' disclosures and the law enforcement policies subsumed therein, we should charge, in addition to the corporation, only the primarily responsible corporate officer, Keeler, with a one count non-willful violation of Sec. 610."

[Deft. Exh. 9, B–12 at 5–6]

45. In accordance with this prosecutive policy and with the previously negotiated plea bargain between McBride, Finney and Keeler, on December 4, 1973, Phillips and Keeler were charged with and pled guilty to one count each of misdemeanor violations of 18 U.S.C. § 610, in the United States District Court for the District of Columbia (their Criminal No. 998–73) [Deft. Exh. 9 A–1]. The transcript of the proceedings of that date reveals the following statement by McBride with regard to the plea agreement:

"MR. McBRIDE: Phillips Petroleum Company and Mr. Keeler came to the Special Prosecutor's Office some months ago, in August, and disclosed voluntarily to us the making of the corporate contribution, that is, the $100,000.00 contribution to the Finance Committee for the Re-Election of the President, to the Office of the Special Prosecutor.

At that time, there was no understanding as to any charge or disposition that the Special Prosecutor might decide upon. However, the Special Prosecutor had stated that in instances where corporations come forward voluntarily and confess to violations of Section 610 that that voluntary disclosure and their cooperation in the course of the ensuing investigation would be brought to the attention of the Court.

I, at this time, would like to point out to the Court that both Phillips Petroleum Company and Mr. Keeler did come forward voluntarily, that is, we had not begun to investigate at the time they came to us, and they did cooperate fully in the investigation that followed.

I should further note that this charge, that is, of the $100,000.00 contribution, represents the largest of the illegal corporate contributions made by Phillips Petroleum Company within the period of the statute of limitations. However, Phillips disclosed to us—and it is embraced with the disposition of this matter—contributions to a substantial number of congressional and senatorial candidates in 1970 and 1972, totalling about fifty to sixty thousand dollars. Again, those contributions were voluntarily disclosed by Phillips Petroleum Company and they cooperated in the investigation in connection with those.

THE COURT: Has the statute run on those?

MR. McBRIDE: The statute has not run, Your Honor, but it is our policy at

the outset to charge the largest of the illegal corporate contributions, and we follow that policy in this case.

THE COURT: That means you are not going to press the other charges?

MR. McBRIDE: Not against Phillips or Mr. Keeler. We, of course, always hold open the option of pressing our investigation as to the recipients of illegal corporation contributions.

I have nothing further, Your Honor." [Deft. Exh. 9, A–1 at 2–4].

46. The Court accepted the guilty pleas and fined Phillips $5,000 and Keeler $1,000. [Deft. Exh. 9, A–1 at 5].

47. The parties are in accord that there was an agreement between the United States and Phillips and Keeler, negotiated by McBride and Finney, as to the disposition of the matters before the WSPF. [Proceedings of February 17–18, 1977, Tr. 252–54; 407–08].

48. Defendants contend that excepted from the agreement was prosecution for violations of the Tax Code, and Mr. Finney testified that by such violations were meant Title 26 violations. [Proceedings of February 17, 1977, Tr. 253–55; 265; 302; 310].

49. The Government contends that the exception was that the agreement would not dispose of any civil or criminal liability of Phillips or its officers within the jurisdiction of the I.R.S. [Proceedings of February 18, 1977, Tr. 408; 416]; that one phrase McBride used was "As far as I.R.S., you are on your own" [Proceedings of February 18, 1977, Tr. 409]; and that the plea agreement did not extend any immunity to Phillips and its officers from criminal tax exposure [Proceedings of February 18, 1977, Tr. 413]. It is the Government's position that such exception left open prosecution for tax offenses, which would include a Title 18 conspiracy to defraud the United States such as is charged in Count I of the indictment in this case.

50. The Court finds that the evidence supports the contention of the defendants that the exception to the plea agreement was limited to Title 26 offenses. A reading of the testimony of Finney and McBride, together with Defendants' Exhibit 9, C–8, entitled "Memorandum of Understanding Re Handling of Internal Revenue Matters Arising in Connection with Investigation and Prosecution of 18 U.S.C. 610 (Illegal Corporate Contributions) Matters", leads the Court to the conclusion that only Title 26 offenses were excepted from the plea agreement.

51. The Court finds that the following testimony adduced during the evidentiary hearing of February 17–18, 1977, substantiates the decision rendered herein:

(Mr. Finney) "Mr. Williams, I don't recall any specific discussion of a conspiracy charge with Mr. McBride, but the understanding was that they were disposing of all criminal charges, subject to the exception that they specified, and I certainly contemplated that the most serious charge that we potentially faced at that time was the conspiracy charge and regarded it as being disposed of. I think Mr. McBride probably also regarded it as being disposed of, but that's—we specifically contemplated all charges other than tax charges. [Tr. 255].

\* \* \* \* \* \*

THE COURT: "Mr. Finney, let me ask you a question. Had you had any doubt at all about this being dispositive of all criminal matters, would you have allowed your client, Mr. Keeler, to plead guilty?

THE WITNESS: No, sir." [Tr. 257].

\* \* \* \* \* \*

THE COURT: "Mr. Finney, let me ask you one other question. You said the Board of Directors directed you to make this disclosure and you started working with the Special Prosecutor and then went on with your investigation and all. When you made your agreement, plea agreement—we will say it that way—with the Special Prosecutor, as you said, you wouldn't allow Mr. Keeler to plead unless that took care of the criminal matters, any further criminal matters?

THE WITNESS: Yes, sir.

THE COURT: And you represented Phillips. Did you conclude that to mean not

only Phillips and Mr. Keeler but all executives of Phillips, having been directed by the Board and hired by the Board?

THE WITNESS: Yes, sir, Your Honor, for the reason, and I can't—it's hard for me not to mix fact and opinion in some of these comments but as far as our investigation disclosed, there was a single course of action in which these men participated and that had been disclosed to the Special Prosecutor. We had talked of the participation and involvement of others, in addition to the three Officers that they elected to interview. Their explanation to me was that they chose to interview Mr. Keeler because he had made the contribution to the Finance Committee to Re-Elect the President and knew firsthand the circumstances surrounding that contribution. They asked to interview Mr. Slack specifically on the subject of Congressional contributions. Their interest in interviewing Mr. Houchin, which as I said, didn't really materialize until sort of the day before the matter was to be disposed of, stemmed from the fact that Mr. Houchin had custody of the funds that had been used for the political contributions; but each of these three men were asked questions on areas that extended beyond that primary area of concern and the participation of others was disclosed to the Prosecutor in the course of our discussions of the problem.

So that, particularly on the conspiracy charge, we had been from the very beginning, had felt that the most dangerous charge that could be brought on the basis of the facts that we knew was a conspiracy charge, because it would involve the largest number, potentially involve the largest number of people in the Company and, of course, extend over a considerable period of time because the indication that we had was that it went back to 1964; so that when the Special Prosecutor said, in effect, that they would charge a single officer with a single count of a 610 violation and do so by misdemeanor, we were really talking about one person stepping forward, in terms of the, in effect, misconduct that had been disclosed to the Special Prosecutor.

THE COURT: All executives from '64 to that time, you are talking about?

THE WITNESS: Yes, sir, and I had specifically indicated on the basis of the investigation that I made, I had mentioned to them the fact that Mr. Learned had some role in this matter prior to the time that Mr. Keeler became chairman and chief executive officer. I had referred to others, not by name but by description, simply of the role that they had played.

I don't want to mislead the Court, I don't want to overstate the nature of the discussions that we had because these were not the matters on which the Special Prosecutor was primarily concerned but when we first started our discussions, prior to the time that there was this exclusion or exception made with respect to Title 26 offenses, when we first started the discussion that was not the scope of the Special Prosecutor's interest. He initially wanted sufficient detail as to the source of the funds, the way they were generated, the way they were treated for tax purposes, so that he could assess, prior to a plea, whether or not there were criminal tax violations that should be taken into account, and he even said specifically that it would be his practice or his intention to go and talk to the I.R.S. about it. He then subsequently concluded not to proceed in that way and rather to exclude these tax offenses.

But the reason that I mention this is that much of this discussion that we had had involved the roles of other people prior to the time that we reached that conclusion. So, I felt like we were discharging everybody.

THE COURT: Discharging everybody connected with the Company and the Company on this plea?

THE WITNESS: That is correct.

THE COURT: In other words, the generation of the money had been disclosed, the manner in which and the contributions and the donees, I think you said?

THE WITNESS: Yes, sir." [Tr. 263–66].

\*    \*    \*    \*    \*    \*

Q. (Mr. McDermott): "Mr. Finney, in the efforts that you exerted to investigate the matter before the Special Prosecutor, other than the production of the witnesses that you have named, did you investigate the source of the funds which gave rise to the contributions?

A. Yes, sir, I did.

Q. And did you report it to the Government?

A. Yes, sir. Let me say this, Mr. McDermott. The matters to which we gave our primary attention in the course of this investigation were, in effect, dictated by those matters that the Special Prosecutor or members of his staff were asking us to find out, determine and report to them; and so that for the period from August through December, that served to focus the nature of the investigation because we were trying to be specifically responsive to their requests.

Q. And did they—

A. However, from the very beginning— excuse me—from the very beginning, we were also developing in the course of the investigation information as to the source of the funds, how they were originally generated, how the funds had been handled; and these matters had been discussed with representatives of the Government during that period, in effect not only with the Special Prosecutor, there was some discussion along this line with members of the staff of the Watergate Committee; there was, as you know, a formal communication to the I.R.S. in the early part of October, so those matters were discussed with them." [Tr. 258–59].

*      *      *      *      *      *

(Mr. Finney) "The Special Prosecutor, after the decision that we would be in effect, as one expressed it at one time, 'on our own with the IRS', he showed no particular curiosity about the kind of detail of the origin of the funds that would be relevant primarily to an assessment of taxes. He was interested in what the scheme was and he was told what the scheme was and how it worked. After the decision was made that we would exclude from, we would except from the disposition of the matter violations of the—criminal violations of the Tax Code, he was then not interested in pursuing the kind of detail that would be primarily relevant to an assessment of the taxes." [Tr. 302].

*      *      *      *      *      *

(Mr. Finney) "Well, we came to a joint conclusion with the Special Prosecutor that the way we would proceed was that we would except from the plea bargain violations of the Internal Revenue Code. We advised the Special Prosecutor that we would deal with the IRS directly. He said in effect you are on your own as far as any criminal tax charges are concerned. This was the arrangement that was reached with the Special Prosecutor. This reflected in part his own preferences and conveniences. If you have read the file of the documents produced by the Government you will know that about this time the IRS and the Special Prosecutor had for reasons known to them, not to me, arrived at an arrangement that this was to be the standard procedure followed in these cases." [Tr. 310].

*      *      *      *      *      *

(Mr. Witten) "Well, the best indication of what Mr. Finney said, I think, is in my memorandum of the meeting [of October 10, 1973]. My independent recollection of that meeting is considerably less vivid than my recollection of the meeting as refreshed by that memorandum. But I think he set forth in general terms a course of events in which we were given to understand that the money had been taken abroad and brought back in some way or was somehow brought in from abroad, and had been stored in a cash form in the control of Phillips and used at the discretion of certain persons at Phillips." [Tr. 362–63].

*      *      *      *      *      *

Q. (By Mr. Williams) "In that memorandum of understanding between I.R.S. and the Department of Justice, it's recited, isn't it, Mr. Quarles, that in the Phillips agreement with the Watergate office, the right

that was reserved by the Watergate Prosecutor's office was to prosecute for possible violations of Title 26, isn't that so, isn't that what it says?

A. Yes, it says a specific right to proceed was reserved.

Q. *For Title 26 violations?* (emphasis supplied)

A. *That is correct, right.* (emphasis supplied)

Q. And Title 26 violations are Internal Revenue Service criminal violations, isn't that right?

A. They are.

Q. And those are the violations that are set out in Counts 2 through 7 of the case that is before His Honor right now, is that not so? Those would be Title 26 violations, wouldn't they?

A. I believe they would." [Tr. 399].

\* \* \* \* \* \*

Q. [By Mr. Williams] "And over here, Mr. Quarles, may I just turn your attention now to one final document, the memorandum of understanding signed by your boss, Mr. Ruff—he was your boss, wasn't he?

A. He sure was.

Q. That was signed on June 11, '75, says that the agreement in the case of Phillips—

A. I don't believe I was employed there then but I will help.

Q. I think weren't you still there then?

A. I may very well have been.

Q. I remember you there in 1975.

A. Oh, I was there in 1975.

Q. Because you and I were in Court there in 1975 for about three or four weeks.

A. Now that you mention it, I remember that.

Q. Do you remember that—

A. But I do believe I left in June of 1975.

Q. Okay. It was agreed in the case of Phillips that there would be a reservation of rights to proceed under Title 26, isn't that so?

A. That is.

Q. That was the reservation, right, to go under Title 26, that is what it says, that is what Mr. Ruff signed, isn't it?

A. That is exactly what it says.

Q. And the part of this case that is brought under Title 26 is Count 2, Count 3, Count 4, Count 5, Count 6, Count 7, right?

A. That is right.

Q. Not Count 1, right?

A. Count 1 charges 371, right." [Tr. 399–401].

\* \* \* \* \* \*

THE COURT: ". . . So, he [Mr. Finney] stated that whatever arrangement he made with you, he had no notes necessarily on them; whatever you said, he felt he was safe in saying. Now, during those conversations, he stated that he revealed the source, the generation and the donations and the list to whom they were donated. You gave him a list of questions?

THE WITNESS [Mr. McBride]: Yes.

THE COURT: Part of them to name the donees, I believe?

THE WITNESS: Yes.

THE COURT: Was that done?

THE WITNESS: Yes. Insofar as the source of funds, he told me that this money had been accumulated when, I think it was 1964, the early 60's, when a fellow named Boots Adams was chairman of Phillips, that had been generated overseas in some fashion, I don't know if he told me the details, and my recollection was that it was about $600,000 and it had been brought back here back in the 60's, put in a safe and that they were still drawing right up to '72 on those earlier accumulated funds, for making political contributions.

I also insisted that he disclose to us all of the contributions made to Federal candidates from 1968 up until that time, and that was a bone of some contention and eventually he bowed to my insistence and gave me a list of what he represented were all of the contributions to Federal candidates during that time." [Tr. 409–10].

\* \* \* \* \* \*

THE COURT: ". . . Mr. McBride, what was the first meeting you recall having with Mr. Finney?

THE WITNESS: August 15th, 1973.

THE COURT: August 15th, 1973.

THE WITNESS: Right.

THE COURT: And did that go through, I think, as he testified, through either you or one of your assistants, to the day before, I believe December 3rd, before the plea?

THE WITNESS: Right, there were a number of meetings during that time frame.

THE COURT: During that period of time, as he stated yesterday, in fact, he said he didn't even take notes on a lot of it because anything you said, he knew he didn't have to take notes.

THE WITNESS: I feel the same way about Mr. Finney." [Tr. 409].

\*     \*     \*     \*     \*     \*

Q. (By Mr. Williams) "And you do recall, do you not, Mr. McBride, that during one of the sessions that you had with Tom Finney, that he told you that the monies in question had not been recorded on the company books?

A. I don't know if he specifically said that. His description of how they were generated certainly led me to believe they wouldn't be reflected on the company books.

Q. As a sophisticated veteran prosecutor of State and Federal experience and national reknown, you knew that that was a reasonable inference to be drawn from what he told you?

A. Certainly. It would defeat the object of secrecy.

Q. It would defeat the concealment, would it not?

A. Yes." [Tr. 423–24].

■ Based upon the foregoing excerpts, the Court finds that the exception to the plea agreement was limited to Title 26 offenses, and that Finney, on behalf of Phillips and its officers, disclosed to the WSPF before the plea was entered, the source, generation and handling of the funds, and the political contributions made with those funds.

52. The Court's finding that the exception to the plea agreement was limited to Title 26 offenses is further supported by Defendants' Exhibit 9, C–8, the "Memorandum of Understanding" executed on December 14, 1973, by Henry S. Ruth, Jr., Deputy Special Prosecutor, and John F. Hanlon, Assistant Commissioner (Compliance) Internal Revenue Service, Washington, D. C. This document contains the understanding between WSPF and the Internal Revenue Service as to the procedure for consulting the IRS on the tax aspects of any § 610 violations discovered by the Special Prosecutor on possible tax violations committed in connection with corporate contributions. The Memorandum specifically refers to Phillips and states as follows:

> "The specific right to proceed criminally for possible violations of Title 26 with regard to political contributions disclosed to the Special Prosecutor has been reserved in the case of Phillips Petroleum." [Deft. Exh. 9, C–8 at 1].

53. A subsequent "Memorandum of Understanding" dated June 11, 1975, and signed by Cono R. Namorato, Chief, Criminal Section of the Tax Division of the Department of Justice; Charles Ruff, Assistant Special Prosecutor for WSPF; David Gaston, Director of the Criminal Tax Division of the Office of the Chief Counsel of the IRS; and Robert Potter, Assistant Director, Intelligence Division of the IRS, contains the following agreement with regard to Phillips Petroleum Company:

> "that recommendations to prosecute these corporations and/or the corporate officer(s) for possible criminal violations under Title 26 will not be jeopardized by reason of nominal fines or sentences received by these taxpayers for non-tax violations, the dual prosecution policy of the Department of Justice and/or IRS notwithstanding." [Deft. Exh. 9, C–9].

54. The Court finds that, because the plea agreement excepted only tax charges under Title 26 of the United States Code, and because the conduct alleged in Count I

of this indictment was disclosed to the Special Prosecutor before the plea was entered, the prosecution for the conduct alleged in Count I of this indictment and charged under Title 18 of the United States Code, is barred by the terms of the plea agreement. [See Findings Nos. 50 and 51].

55. During the proceedings of February 17, 1977, Mr. McDermott, counsel for William W. Keeler, advised the Court that based upon Finney's testimony, Keeler was bound by the agreement negotiated by Finney, and that there was no separate or different agreement negotiated for Keeler:

(Mr. McDermott) "If the Court please, in view of the testimony of Mr. Finney and the documents that confirm his testimony to my judgment to an unassailable point, I have reached the conclusion that Mr. Keeler's testimony so far as the issues are concerned would be cumulative, that he could add nothing to it except the detail in which he may have understood the arrangement more broadly than has been proved here, but on the other hand I am convinced that the bargain was negotiated by Mr. Finney and that we are bound by it in any circumstance whether we knew it in the precise detail or not, and certainly we don't take the position that Mr. Keeler drove a new bargain on the day of his plea; . . ."

[Proceedings of February 17, 1977, Tr. 322–23].

56. Additionally, the Court finds that the prosecution of Count I of this indictment is barred on another ground— that the conduct alleged in Count I is part of a single conspiracy which was covered by the plea agreement, as is shown more fully below.

57. Finney testified at the hearing of February 17, 1977, that ". . . the most serious charge that we potentially faced at that time was the conspiracy charge and regarded it as being disposed of." [Proceedings of February 17, 1977, Tr. 255]. He also stated:

"So that, particularly on the conspiracy charge, we had been, from the very beginning, had felt that the most dangerous charge that could be brought on the basis of the facts that we knew was a conspiracy charge, because it would involve the largest number, potentially involve the largest number of people in the company and, of course, extend over a considerable period of time because the indication that we had was that it went back to 1964; so that when the Special Prosecutor said, in effect, that they would charge a single officer with a single count of a 610 violation and do so by misdemeanor, we were really talking about one person stepping forward, in terms of the, in effect, misconduct that had been disclosed to the Special Prosecutor."

[Proceedings of February 17, 1977, Tr. 264–65; see also Finding No. 51, p. 16].

58. The Court finds that the "misconduct that had been disclosed to the Special Prosecutor" included generation of the funds, the use of Swiss bank accounts, the transfer of cash to the United States, the concealment of the funds in office safes in Bartlesville, and the making of political contributions from the fund. [See Finding Nos. 43 and 51].

59. Finney testified that all of the misconduct disclosed to the Special Prosecutor was part of one conspiracy:

Q. [By Mr. Cotton] "Now, you have other—you stated, I believe, Mr. Finney, that you were afraid of the conspiracy charge.

A. Yes, sir.

Q. And what conspiracy was that?

A. Well, there was only one, Mr. Cotton, to my knowledge.

Q. And that was a conspiracy to make illegal political contributions, is that right, Mr. Finney?

A. And to make arrangement to provide the funds, arrange the system for doing so."

[Proceedings of February 17, 1977, Tr. 297].

60. McBride testified, and his prosecutive memorandum reflects, that, prior to the entry of the plea on December 4, 1973, to the § 610 misdemeanor charge, he had

sufficient information to charge a conspiracy under 18 U.S.C. § 371. The record reflects the following colloquy:

Q. [By Mr. Williams] "Now, when you dealt with Tom Finney, in your prosecutive memorandum, that you prepared for Mr. Jaworski, you pointed out, did you not, Mr. McBride, "that as a matter of law and with testimony we now possess, as a matter of proof, it is possible to charge Keeler, Houchin and Slack each with two-count felony violations of 18 U.S.C. 610 and/or a conspiracy to violate 18 U.S.C. 371," right?

A. [By Mr. McBride] That is correct.

Q. But in your agreement with Finney, you agreed not to bring an 18 U.S.C. 371 to violate 610, did you not?

A. I don't think we discussed it specifically.

Q. But it was certainly understood between—

A. I certainly thought it would be a breach of the understanding if we brought a conspiracy to violate 610." [Proceedings of February 18, 1977, Tr. 421. See Deft. Exh. 9, B–12 at 5].

61. The Court finds that the conduct alleged in Count I was part of a single conspiracy which had as one of its objects the violation of 18 U.S.C. § 610, and which was covered by the plea agreement between WSPF, Phillips and Keeler. The Court finds that the generation and concealment of the funds, and failure to record the funds on the company books, was all part of the same course of conduct as the making of political contributions. The indictment in this case evidences the relationship between the generation and concealment of the funds and the making of political contributions. The "Means and Methods" portion of Count I not only alleges facts relating to the generation· and concealment of the funds, but also alleges as follows:

"6. Funds from Swiss accounts would be withdrawn from the accounts in cash from time to time and returned to the Company headquarters in Bartlesville, Oklahoma where said funds would be held in a confidential cash fund and used to make concealed payments which would not be properly recorded on the Company's books of financial account."

62. In further support of the Court's finding that the conduct in Count I was part of a single conspiracy covered by the plea agreement, and is therefore barred from prosecution, the Court received into evidence during the hearing of February 17–18, 1977, Defendants' Exhibits 12–16, which are copies of Indictments and Informations filed by the Special Prosecutor in five cases, charging conspiracies to violate § 610. In each of these cases, a single conspiracy was averred in Count I of the Indictment or Information—a conspiracy to violate § 610—which conspiracy included both the way in which the funds were generated, the way in which the funds were concealed and disguised, and the way in which the funds were paid out to candidates. [Deft. Exh. 12–16; Proceedings of February 18, 1977, Tr. 421]. McBride testified that he had enough proof to charge Phillips and its officers with a conspiracy under 18 U.S.C. § 371. [Proceedings of February 18, 1977, Tr. 421]. McBride further testified that if the Special Prosecutor's office had charged Phillips and its officers with a conspiracy to violate § 610, it could have, as in the five Indictments and Informations referred to supra, alleged the manner in which the funds were generated and concealed as part of the conspiracy. [Proceedings of February 18, 1977, Tr. 421]. Consistent with this Court's finding that the conduct in Count I of this indictment was part of a single conspiracy covered by the plea agreement is a memorandum filed by the Government during the grand jury investigation of the case before this Court. In seeking to defeat a claim of attorney-client privilege for certain documents, the Government set forth the relationship between the generation of funds alleged in Count I and their use for corporate political contributions. In its memorandum, Defendant's Exhibit 17, the Government stated in part:

"The Government has received evidence and can establish, to the satisfaction of

the Court, that in 1963, Stanley Learned enlisted the aid of Paul Parker, Vice-President in charge of the International Department, *to establish Swiss bank accounts for the purpose of receiving and holding concealed funds for Phillips to use in making political contributions around the World.* The device by which Learned generated the funds was a contract with Procon Construction Company involving the payment of a fixed fee of three and one-half million dollars. Procon, by a subsequent agreement, remitted two million dollars to entities designated by Phillips Petroleum International Corporation. The two-million dollars was thereafter transferred through Procon to the Swiss bank accounts styled Pemond and Grandelle. The monies were used to make a $900,000 payment to Intrade Associates, *and the excess was held in the Swiss Accounts for use by Phillips in maintaining its political slush fund in Bartlesville, Oklahoma.* Periodically, Phillips personnel, including Paul J. Parker, John Houchin and W. F. Martin made trips to Switzerland to withdraw and return funds to this country. *The monies brought into this country were not recorded on Phillips' books and records and were not reported in its tax returns.* . . . Phillips has also entered a plea of guilty to a violation of the Federal Corrupt Practices Act.

\* \* \* \* \* \*

The Government can also establish that *Stanley Learned and Paul Parker gave birth to two additional devices designed to continue the funding of the political contributions slush fund.* Mr. Houchin has testified that when he received his assignment from Stanley Learned to be the U.S. custodian of monies brought back into the country, he was assured by Mr. Learned that the monies were Phillips funds, and that the taxes had been paid. Houchin has also testified that he was informed by Learned or Parker that there would be a continuing source of funds. *The devices by which Phillips continued to generate funds for the Swiss bank accounts are a consulting agree-* *ment with Procofrance and a shipping commission from the Triton Shipping Company.*" [Deft. Exh. 17; Government's Memorandum Regarding the Phillips Assertion of Privilege Respecting 38 Documents Subpoenaed by the Grand Jury, at 5–6 (Jan. 1976) (emphasis supplied)].

63. The Securities and Exchange Commission, following an investigation into the generation of funds and the making of corporate contributions, alleged that the activity constituted a single course of conduct. Paragraphs 13 and 14 of the Complaint in *Securities and Exchange Commission v. Phillips Petroleum, William F. Martin, William W. Keeler, John M. Houchin and Carstens Slack,* United States District Court for the District of Columbia, No. 75–308 (Deft. Exh. 18) state as follows:

"13. During the period from 1963 to date hereof, defendants PHILLIPS, KEELER MARTIN, HOUCHIN, SLACK and others engaged in a course of conduct whereby they maintained a secret fund of corporate monies, which were used for unlawful political contributions and other purposes.

14. During the period from 1963 until date hereof defendants PHILLIPS, KEELER, MARTIN, HOUCHIN, SLACK and others, aiding and abetting one another, caused to be disbursed in excess of $2.8 million in PHILLIPS corporate funds to two Swiss bearer stock repository corporations by means of false entries on the books and records of PHILLIPS. Said disbursements were converted into cash and in excess of $1.3 million of this fund of cash was returned to the United States. Of this latter sum approximately $600,000 was expended for political contributions and related expenses, a substantial portion of which was unlawful. The balance of the funds channeled into these Swiss corporations was distributed overseas in cash."

64. The Court finds that the course of conduct alleged in Count I was disclosed to

the Special Prosecutor and was part of a single conspiracy which had as one of its objects the violation of § 610.

65. The Court finds that the plea agreement bars prosecution for the single conspiracy and any part thereof, including the conduct alleged in Count I of this indictment.

66. The Court finds that Phillips and Keeler, on behalf of themselves and the present and former officers of Phillips, were induced by and relied upon the plea agreement with WSPF when they entered their pleas of guilty on December 4, 1973, in Washington, D.C. [Proceedings of February 17–18, 1977, Tr. 257; 313; 384; 414].

67. The Court finds that the prosecution of Count I of this indictment is a breach of the plea agreement.

68. The Court finds that Count I of this indictment must be, and therefore is, dismissed.

## CONCLUSIONS OF LAW

Based upon the foregoing Findings of Fact, the Court makes the following Conclusions of Law:

1. When the United States Government gives its word to or makes an agreement with one of its citizens, the Government must be held to that agreement and keep its promises. The United States Supreme Court held in Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), that where a plea of guilty by a defendant rests in any significant degree upon the promise or agreement of the Government, such promise must be fulfilled. The most meticulous standards of both promise and performance must be met by prosecutors engaged in negotiating such agreements. Correale v. United States, 479 F.2d 944 (1st Cir. 1973).

2. The Government must be held to its agreement through the remedy of specific enforcement. Santobello v. New York, 404 U.S. at 263, 92 S.Ct. 495; United States v. Carter, 454 F.2d 426 (4th Cir. 1972) (en banc); Correale v. United States, 479 F.2d 944, 949–50 (1st Cir. 1973); United States v. Paiva, 294 F.Supp. 742 (D.D.C.1969).

3. The Court found as a fact that the plea agreement with the Special Prosecutor precludes criminal prosecution, except for Title 26 offenses, for activity disclosed to the Special Prosecutor. The Court further found that the essential elements of Count I were disclosed. Thus, the prosecution of Count I is barred and it must be dismissed.

4. As a separate ground, since Finney and McBride agreed that a conspiracy which had as an object the violation of § 610 was barred by the plea agreement and since the Court has found that the conduct alleged in Count I is part of a single conspiracy which had as one of its objects the violation of § 610, prosecution of that conspiracy, and any part thereof, is barred by the plea agreement and Count I must be dismissed.

5. In reaching the conclusion set forth in paragraph 4 above, the Court is guided by the Supreme Court's decision in Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942). In that case the Court held that even though a conspiratorial agreement may have several criminal objects, nevertheless, since the agreement, not its particular illegal objectives, is the gravamen of the offense under 18 U.S.C. § 371, there is but a single violation of that statute. Thus, here, even though the single conspiratorial agreement may have had two objects (1) the generation of unrecorded and unreported funds in a concealed manner for the alleged purpose of defrauding the United States as set forth in Count I and (2) the making of corporate political contributions, there was but one illegal agreement and but one violation of 18 U.S.C. § 371.

The Government may not break down a single conspiracy into component

sub-agreements for the purpose of multiple punishments or multiple prosecutions. *U. S. v. Tanner,* 471 F.2d 128, 141 (7th Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972); *See also, e. g., United States v. Young,* 503 F.2d 1072, 1075 (3rd Cir. 1974); *United States v. Palermo,* 410 F.2d 468, 470 (7th Cir. 1969); *United States v. Cohen,* 197 F.2d 26, 29 (3rd Cir. 1952). This Court has found that the generation and concealment of unrecorded and unreported funds and the making of political contributions were objects of the single conspiratorial agreement disclosed to the WSPF. Keeler and Phillips, on behalf of itself and its officers, were promised that there would be no criminal prosecution for the conspiratorial agreement disclosed to the WSPF. Count I was brought in breach of that promise. To hold otherwise would be to permit the Government to bifurcate a single conspiratorial agreement. Since even the Government in its prior pleading has stated that the motivation for the generation of the funds was for use in making political contributions, there is no basis for concluding that this course of conduct constituted two conspiracies. There is no evidence that there were two independent agreements; indeed, all the evidence points to the fact that there was a single conspiracy. Thus, Count I must be dismissed.

6. The Government appeared to argue at the hearing on this motion that the Special Prosecutor did not receive sufficient information from Phillips on which to base a charge of conspiracy to defraud the United States and therefore that such a charge could not be foreclosed by the plea agreement. For the reasons set forth above that argument is factually incorrect. It is legally incorrect as well. In *United States v. Tanner,* 471 F.2d 128 (7th Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972), the Government argued that the *Braverman* principle was not applicable to bar a second conspiracy prosecution because, at the time of the first prosecution, the Government lacked information as to the full scope of the conspiracy. In rejecting the argument, the Court of Appeals said:

"The Government claims an exception to this [the *Braverman*] rule where it was unaware of all the defendant's crimes at the time of the initial proceedings. *See Ashe v. Swenson,* 397 U.S. 436, 453 n. 7, 90 S.Ct. 1189, 25 L.Ed. 469 (1969) (concurring opinion); *United States v. Buonomo,* 441 F.2d 922 (7th Cir. 1971). But that exception raises very difficult problems of analysis particularly where the Government's investigation evolves slowly over a period of months. It is often not a question of the Government knowing the exact parameters of the second offense even while prosecuting the first, or alternatively, having no inkling of any further offenses. There may be intermediate stages ranging anywhere from vague intimations to strong suspicions. *We are of the view that suspicions of a larger continuing conspiracy, but does not have sufficient evidence to proceed to indictment, it cannot be permitted, consistent with Braverman, to fragment prosecution so as to insure that some offenders will come to trial and thereby avoid the risks of a single conspiracy prosecution.*" 471 F.2d at 141–42 (emphasis supplied.)

Thus, the Court of Appeals held that even though the Government lacked knowledge of the full scope of the conspiracy at the time it initiated the first proceeding, since the Government was not "completely ignorant" of a larger conspiracy, the Court would not allow multiple prosecutions. 471 F.2d at 142. In the instant case, the Government can hardly contend that at the time of the plea agreement it was "completely ignorant" of the generation of concealed funds alleged in Count I.

7. The conclusion reached in this case finds support in the recent decision of the Eight Circuit in *United States v. Minnesota Mining and Manufacturing Co.,* 551 F.2d 1106 (8th Cir. 1977). That case is remarkably similar to this one. Like Phillips, Minnesota Mining and Manufacturing (herein referred to as "3M") responded to the July 6, 1973 invitation of the Special Prosecutor and acknowledged a corporate contribution to the Nixon Campaign. After discussions

between counsel for 3M and the Special Prosecutor's Office, an agreement was reached under which 3M and an officer pled guilty to § 610 violations in exchange for an agreement that the pleas would be fully dispositive of all criminal charges arising from the campaign contributions. 3M and two officers were subsequently indicted for conspiracy to defraud the United States by interfering with the functions of the IRS and on two substantive charges. The defendants moved to dismiss the indictment on the basis of the plea agreement. There was a dispute as to whether the plea agreement foreclosed prosecution for tax offenses. The District Court resolved that issue in favor of the defendants, finding that the plea agreement was dispositive of all federal criminal liability arising out of the campaign contributions. The District Court concluded that the Government breached the plea agreement by prosecuting the defendants and the Court ordered dismissal of the indictment. After a careful review of the facts, the Court of Appeals affirmed the dismissal of the indictment.

The case at bar differs only slightly from *Minnesota Mining and Manufacturing.* Here the parties agreed to exclude Title 26 offenses from their plea bargain. Accordingly, the defendants have not moved for dismissal of the Title 26 counts, Counts II–VII, on the basis of the plea agreement. However, as to the prosecution of Count I, the case is virtually identical and, like the Court in 3M, this Court concludes that the plea agreement has been breached and the proper remedy is dismissal of Count I.

