Richard ROE, Petitioner,

v.

UNITED STATES ATTORNEY, Eastern District of New York, and United States Marshal Service, Respondents.

No. 79C1500.

United States District Court,
E. D. New York.

June 15, 1979.

Richard Roe, petitioner, pro se.

Edward R. Korman, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., by Joel Cohen, Sp. Atty., U. S. Dept. of Justice, Organized Crime Strike Force, Eastern District of New York, Brooklyn, N. Y., for respondents.

MEMORANDUM AND ORDER

NEAHER, District Judge.

Petitioner Richard Roe brought this action pursuant to 28 U.S.C. §§ 1361 and 1651

(and, presumably, 28 U.S.C. § 1346(a)(2)) to obtain an order compelling the United States Attorney for this District and the United States Marshals Service to honor certain promises made to him and his wife by a Department of Justice Special Attorney assigned to this District's Organized Crime Strike Force ("Strike Force") and a Special Agent of the Drug Enforcement Administration ("DEA"). Although Roe is presently serving a State sentence of 25 years to life, he has been in federal custody since May 19, 1978, at first pursuant to a writ of *habeas corpus ad testificandum*, and more recently by formal arrangement with the State of New York. A previous petition for similar relief was dismissed by the court without prejudice on February 1, 1979, on respondents' representation that the government intended fully and with reasonable dispatch to comply with all commitments that had been made to petitioner and his family. Thereafter, the government attorney advised both the court and petitioner that specific promises could not be kept: hence, the renewed application, for which leave to proceed *in forma pauperis* is granted. See 28 U.S.C. § 1915(a).

The material facts are largely undisputed. For what the government describes as a substantial period of time, petitioner and his wife served as informants for the Drug Enforcement Administration, with the understanding (1) that their efforts on behalf of the government would be brought to the attention of the State agency or agencies having the power to reduce petitioner's lengthy sentence, see Cohen Aff. (3/30/79), ¶ 2,[1] and (2) that appropriate arrangements would be made for their safety, and that of their four children, when developments in the investigation they were aiding made further concealment of their respective roles impossible, see *id.* at ¶ 5; Roe Letter (2/26/79), at 1. Matters took an unexpected turn in May 1978, however, when New York prison authorities failed to act on information provided by petitioner in time to

head off an escape from the State's Green Haven Correctional Facility, where petitioner was then incarcerated. The incident generated some embarrassing publicity for the New York State Department of Corrections, which compounded its error by transferring petitioner to another State institution at a time and in a manner that served to identify him as the source of the fruitless tip. The resulting threat to petitioner's safety was obviously of sufficient gravity to warrant intervention by federal prosecutors, who caused him to be brought under their control by means of a writ ostensibly requiring him to be made available to testify before a federal grand jury.

The critical stage in the DEA–Strike Force narcotics case was not reached, however, until early September 1978, when the investigation culminated in a pair of arrests. Petitioner's wife and family were immediately "relocated" by the United States Marshals Service, presumably under the Witness Protection Program, see Sections 501–04 of the Organized Crime Control Act of 1970, Pub.L.No. 91–452, 18 U.S.C. prec. § 3481, at first temporarily and thereafter to their "designated" location. From May through the time of the September arrests, petitioner remained in federal custody pursuant to the writ of *habeas corpus ad testificandum.*

Following the arrests, and the relocation of his family, petitioner was advised by Special Attorney Cohen that his request to be "designated" to a specified minimum security federal correctional facility within close proximity to his family's new location would be granted, and that his transfer to that facility would be accomplished within one month. Nonetheless, no formal request for petitioner's release from State into federal custody was made until September 20, 1978, and the process was not completed until late December. Cohen Aff., *supra,* ¶ 4. In the interim, no progress was made toward petitioner's eventual classification

---

1. Petitioner also claims he was promised that his incarceration would come to an end within three years after he began to cooperate with law enforcement agencies. Roe Letter (2/26/79). Respondents denied that such a promise was made. Cohen Aff. (3/30/79), ¶ 10. In any event, the issue is not now before the court.

and transfer, apparently because he was not yet a federal prisoner.

Upset by the delay, Roe in mid-January 1979 petitioned the court for an order requiring the United States Attorney and the Marshals Service to comply with the Special Attorney's representations regarding his transfer. In reply, respondents, speaking through Mr. Cohen, assured the court that although an inmate serving a term of imprisonment of 25 years to life is ordinarily ineligible for incarceration in a minimum security institution, the Chief of Witness Security for the Marshals Service had made clear that the Bureau of Prisons would in this case make an exception to its guidelines, so that the government could fulfill its commitment, and that the protracted delay was simply the product of an inordinately high inmate population at the particular institution. Cohen Letter (1/22/79); see also Cohen Letter (12/26/78). Based on these representations, the court, by memorandum order dated February 1, 1979, dismissed the petition, without prejudice to renewal should the government's performance fall short of its admitted undertaking.

Thereafter, the Bureau of Prisons, following review of petitioner's case, announced that because of the severity of his offenses and sentences, it would be obliged to classify him at a medium rather than minimum custody level, thereby precluding his placement at a minimum security institution. See Cohen Letter (2/15/79). Since that time, the Bureau of Prisons has agreed to designate petitioner to either of two federal facilities located within 175 and 220 miles, respectively, of his relocated family,[2]

and the DEA has offered to provide funds so that petitioner's wife might purchase an automobile. To date, petitioner has resisted this "alternative," insisting upon strict observance of the promises made to him, for reasons of his own safety and the welfare of his family. Respondents disclaim any duty to do so, and have moved for summary judgment dismissing the petition.

■ Petitioner's chagrin is understandable. But the narrow issue presented is whether the promises concededly made to him and his wife by the Special Attorney and DEA Special Agent qualify the settled rule, firmly embedded in federal statute and decisional law, that the classification and placement of a federal prisoner—as petitioner now is, for such purposes, see 18 U.S.C. § 5003(c); *Cofone v. Manson,* 594 F.2d 934 at 936 n.1 (2 Cir. 1979)—ordinarily lies within the virtually unreviewable discretion of the Bureau of Prisons. See *Moody v. Daggett,* 429 U.S. 78, 88 n.9, 97 S.Ct. 274, 279 n.9, 50 L.Ed.2d 236 (1976); *Rosati v. Haran,* 459 F.Supp. 1148, 1160–61 (E.D.N.Y.1977); *Catalano v. United States,* 383 F.Supp. 346, 350–51 (D.Conn.1974); *cf. Meachum v. Fano,* 427 U.S. 873, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Procunier v. Martinez,* 416 U.S. 396, 404–05 & n.9, 94 S.Ct. 1800, 1807 & n.9, 40 L.Ed.2d 224 (1974); *Cofone v. Manson, supra; Daugherty v. Harris,* 476 F.2d 292, 294 (10 Cir.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973). Compare *Hohman v. Hogan,* 597 F.2d 490 (2 Cir. 1979); *Cardaropoli v. Norton,* 523 F.2d 990 (2 Cir. 1975). See generally 18 U.S.C.

---

**2.** According to J. D. Williams, Assistant Director of the Bureau of Prisons, the Bureau intends to place petitioner "in an appropriate level institution, where he is not likely to be known to other inmates and where he can function well in the level of programs and security available. Information about his background and reasons for protection will be carefully protected, and made known to the smallest number of staff as possible. In these ways we hope to provide safety for him while [sic] acceptance in the regular prison population." Williams Aff. (4/25/79). In a series of docu-

ments, petitioner contends that his life will be endangered should he be placed in any but a minimum or near minimum security facility, and challenges the sincerity of the representations made by Bureau of Prisons officials. See Aff. in Support of Motion (4/9/79); Roe Letter (2/26/79); Roe Letter (5/14/79). Special Attorney Cohen, on the other hand, indicates that he has been advised by Norman Carlson, the Director of the Bureau of Prisons, that Roe's designation to a non-minimum security facility will be temporary, subject to review after two years. Cohen Aff. (3/30/79), at ¶ 7.

§§ 4042, 4081, 4082(b); 28 C.F.R. §§ 0.95(d), 0.96(c).[3]

Respondents do not, of course, deny that Mr. Cohen and Agent Magno, however gratuitously, assured petitioner and Mrs. Roe that the former would be placed in a particular minimum security federal facility and that regular family visits would be possible. See Cohen Aff., *supra*, at ¶¶ 5 & n.3, 10. It also appears that they did so in good faith, in the belief that their promises could be performed. Unfortunately, the Bureau of Prisons does not consider itself obliged to honor pledges made without its authorization by officers of other agencies. For the reasons which follow, the court agrees.

■ It is axiomatic that "for an agent of the United States to be able to contractually bind the United States the agent must have actual authority to do so." *Rand v. United States*, No. 370–77 (Ct.Cl., September 29, 1978). A careful review of the pertinent statutes and regulations indicates that neither Mr. Cohen nor Agent Magno had the authority to speak for the Bureau of Prisons or, for that matter, for the Marshals Service. Concededly, all four agencies—the Bureau of Prisons, the Marshals Service, the Drug Enforcement Administration, and the Organized Crime and Racketeering Section of the Criminal Division of the Justice Department (which for the most part controls and directs the various Strike Force offices)—are arms of the Justice Department and are subject to the Attorney General's supervision. But Congress, the President and the Attorney General have consistently treated each as an entity distinct and independent within its own sphere. Bureau of Prisons: 18 U.S.C. §§ 4041–4042; 28 C.F.R. §§ 0.96–0.99; Marshals Service: 28 U.S.C. §§ 561–575; 28 C.F.R. §§ 0.111–0.113; Drug Enforcement Administration: Reorg. Plan No. 2 of 1973, 3 C.F.R. 1158 (1971–1975 Compilation), 38 F.R. 15932, 87 Stat. 1091, *as amended*, Act of March 16, 1974, Pub.L.No. 93–253, § 1, 88 Stat. 50, *reprinted in* 5 U.S.C. App., at 839 (1976); Exec. Order No. 11727, July 6, 1973, 3 C.F.R. 785 (1971–1975 Compilation), 38 F.R. 18357, *reprinted in* 21 U.S.C. fol. § 801, at 170 (1976); 28 C.F.R. §§ 0.100–0.104; Strike Force *United States v. Archibold-Newball*, 554 F.2d 665, 681–83 (5 Cir.), *cert. denied*, 434 U.S. 1000, 98 S.Ct. 644, 54 L.Ed.2d 496 (1977); *In re Persico*, 522 F.2d 41, 50–52, 68–71 (2 Cir. 1975); 28 U.S.C. §§ 510, 515, 543; 28 C.F.R. § 0.55(g). See generally 28 C.F.R. §§ 0.138, 0.138a.

Congress has, of course, empowered the Attorney General in the first instance to designate the place of confinement of federal prisoners, see 18 U.S.C. § 4082(a), (b), has committed to his supervision the control, management and direction of the federal penal system, see 18 U.S.C. §§ 4001, 4042, and has conferred upon him the authority "to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses in legal proceedings against any person alleged to have participated in an organized criminal activity," Organized Crime Control Act of 1970, Pub.L.No. 91–452, Title V, § 501, 84 Stat. 922 (1970), *reprinted in* 18 U.S.C. Prec. § 3481, at 1327

---

**3.** Petitioner's reliance on *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1972), and its progeny, including *United States v. Phillips Petroleum Co.*, 435 F.Supp. 622 (N.D.Okl.1977), which he cites, is inapposite, since these cases stand for the proposition that "when a [guilty] plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." 404 U.S. at 262, 92 S.Ct. at 499. As the Seventh Circuit has observed, "[s]trict fulfillment of prosecutorial promises emanates as a requirement from the significant consequences of a *guilty plea* —the waiver of important constitutional rights and the 'adjudi-

cative element' that is inherent in the plea." *United States v. Bowler*, 585 F.2d 851, 853 (7 Cir. 1978) (quoting from *Santobello, supra*, 404 U.S. at 262, 92 S.Ct. at 499) (emphasis supplied). See also *United States v. Phillips Petroleum Co., supra*, 435 F.Supp. at 640. While it would be impossible on the present record completely to reconstruct petitioner's arrangement with the government, it is evident that it could not be characterized as a plea bargain. Indeed, so far as the court is aware, petitioner has never been threatened with prosecution for or charged with a federal offense, and agreed to offer his services for reasons entirely linked to his lengthy State sentence, imposed only after he had been found guilty at trial.

(1976).[4] Yet Congress has also granted the Attorney General broad authority to delegate his various "functions" "[to] any other officer, employee, or agency of the Department of Justice." 28 U.S.C. § 510; see *United States v. Prueitt*, 540 F.2d 995, 1000 (9 Cir.), *cert. denied*, 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977). Thus, the Director of the Bureau of Prisons has by regulation, see 5 U.S.C. § 301, been granted the authority (and responsibility) to classify, place and transfer federal offenders and to contract with State officials for the incarceration of State prisoners. See 28 C.F.R. §§ 0.95(b), (c), (d), (f), 0.96(c). Similarly, the Director of the Marshals Service had been charged with the primary responsibility for administering the Witness Protection Program. 28 C.F.R. § 0.111(c).[5] Each Director has been authorized, in turn, to redelegate his powers and functions, but to his own subordinates only. See 28 C.F.R. §§ 0.97, 0.113.

On the other hand, it is clear that neither Cohen, as a Justice Department Special Attorney, nor Magno, as a Special Agent of the DEA, had the power, in view of the statutes, regulations and executive orders from which they derive their authority, to act for the Bureau of Prisons or the Marshals Service. See 28 U.S.C. §§ 515, 543, 547;[6] 21 U.S.C. §§ 161–165, 878–880, 885; 28 C.F.R. §§ 0.55(g), 0.100–0.104 & appendix; Reorg.Order No. 2 of 1973, as amended, *supra*; Exec.Order No. 11727, *supra; In re Persico, supra*. It is also clear that neither agency could confer such authority upon them. See 28 C.F.R. §§ 0.97, 0.113. That petitioner may have been unaware of the limitations upon the authority of Cohen and Magno does not improve the strength of his case, for

"[w]hatever the form in which the Government functions, anyone entering into an arrangement with the Govern-

---

4. Moreover, subject only to a number of exceptions not relevant here, "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General." 28 U.S.C. § 509.

5. The Bureau of Prisons has a role to play in this regard as well, since its activities include "[p]rovision of suitable quarter for, and safekeeping, care, and subsistence of, all persons charged with or convicted of offenses against the United States or held as witnesses or otherwise." 28 C.F.R. § 0.96(c).

6. These sections of Title 28, U.S.C., provide as follows:

"§ 515. Authority for legal proceedings; commission, oath, and salary for special attorneys

(a) The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought.

(b) Each attorney specially retained under authority of the Department of Justice shall be commissioned as special assistant to the Attorney General or special attorney, and shall take the oath required by law. Foreign

counsel employed in special cases are not required to take the oath. The Attorney General shall fix the annual salary of a special assistant or special attorney at not more than $12,000.

"§ 543. Special attorneys

(a) The Attorney General may appoint attorneys to assist United States attorneys when the public interest so requires.

(b) Each attorney appointed under this section is subject to removal by the Attorney General.

"§ 547. Duties

Except as otherwise provided by law, each United States attorney, within his district, shall—

(1) prosecute for all offenses against the United States;

(2) prosecute or defend, for the Government, all civil actions, suits or proceedings in which the United States is concerned;

(3) appear in behalf of the defendants in all civil actions, suits or proceedings pending in his district against collectors, or other officers of the revenue or customs for any act done by them or for the recovery of any money exacted by or paid to these officers, and by them paid into the Treasury;

(4) institute and prosecute proceedings for the collection of fines, penalties, and forfeitures incurred for violation of any revenue law, unless satisfied on investigation that justice does not require the proceedings; and

(5) make such reports as the Attorney General may direct."

ment takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though . . . the agent himself may have been unaware of the limitations upon his authority."

*Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). See also *United States v. Stewart,* 311 U.S. 60, 70, 61 S.Ct. 102, 108, 85 L.Ed. 40 (1940); *Rand v. United States, supra; Housing Corporation of America v. United States,* 468 F.2d 922, 925, 199 Ct.Cl. 705 (1972); *cf. Jackson v. United States,* 573 F.2d 1189, 1197 (Ct.Cl.1978); *State of Arizona v. United States,* 575 F.2d 855, 859 (Ct. Cl.1978); *United States v. Levering,* 455 F.Supp. 1165, 1168 (D.Del.1978).

This rule is, undoubtedly, a severe one. Its severity is mitigated here, however, by the obvious fact that petitioner and his wife embarked upon their course of assistance to the government long before—and for reasons other than—any promises which may have been made regarding their family's relocation site or petitioner's ultimate place of incarceration. Perhaps more important, the obligation of the Marshals Service to provide for their security has been reduced to a separate agreement, which is not challenged, and is governed, at least in part, by Title V of the Organized Crime Control Act of 1970, *supra,*[7] while the obligation of the Bureau of Prisons to provide for petitioner's care and safekeeping persists quite apart from any contractual undertaking, see 18

U.S.C. §§ 4042, 5003(a); 28 C.F.R. §§ 0.95–0.96.

Accordingly, respondents' motion for summary judgment dismissing the petition is granted.

SO ORDERED.

The Clerk of the Court is directed to enter judgment dismissing the petition. The Clerk is further directed to furnish copies of this memorandum and order to petitioner *pro se* and to counsel for the respondents, and thereafter to maintain the contents of this file and 79 C 150 under seal.

---

7. Section 502 of the Act provides as follows:
"The Attorney General of the United States is authorized to rent, purchase, modify, or remodel protected housing facilities and to otherwise offer to provide for the health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons intended to be called as Government witnesses in legal proceedings instituted against any person alleged to have participated in an organized criminal activity whenever, in his judgment, testimony from, or a willingness to

testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy. Any person availing himself of an offer by the Attorney General to use such facilities may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues."
As noted in text, the Attorney General has delegated his functions under Title V of the Act to the Marshals Service. See 28 C.F.R. § 0.111(c).